1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2           CASE NO. 19-CR-60200-FAM (COHN)

3

4

        UNITED STATES OF AMERICA,          )   Page 44-203
5                                          )
                    vs.                    )
6                                          )   Fort Lauderdale,
        SEBASTIAN AHMED,                   )   Florida
7                                          )   March 9, 2020
                    Defendant.             )   10:00 A.M.
8

9           EXCERPT TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE JAMES I. COHN
10               U. S. DISTRICT JUDGE
                   Volume 2 of 2
11

12   APPEARANCES:

13   For The Government:      CHRISTOPHER CLARK and
                              LISA H. MILLER
14                            United States Attorney's Office
                              99 Northeast 4th Street
15                            Miami, Florida  33132

16   For The Defendant:       JOEL HIRSCHHORN and
                              ANDREW T. SARANGOULIS
17                            GRAY ROBINSON LAW FIRM
                              333 Southeast 2nd Avenue
18                            Miami, Florida  33131

19

20

21

22
     Reported By:             VERNITA ALLEN-WILLIAMS
23   Vernita_Allen-Williams   Official Court Reporter
     @flsd.uscourts.gov       United States District Court
24                            400 North Miami Avenue
                              Miami, Florida  33128
25

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1                    INDEX OF WITNESSES
 2    KAY STEVENS:
 3              Continued Direct Examination..Page 47
 4              Cross-Examination.............Page 55
 5              Redirect Examination..........Page 158
 6              Recross Examination...........Page 201
 7                  EXHIBITS ADMITTED
 8    Defendant's No. 109.........................Page 182
 9    Defendant's No. 110.........................Page 188
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1           (Presence of the jury)

2           (Proceedings reported and not transcribed)

3           THE COURT:  All right.  Miss Stevens, good morning.

4           MR. HIRSCHHORN:  I will correct Your Honor.  This

5     is Mrs. Sheckels (phonetic).

6           THE COURT:  No, this is Miss Stevens.

7           THE WITNESS:  Stevens.

8           MR. HIRSCHHORN:  Oh, sorry.  I forgot it was week

9     four.

10          THE COURT:  You've got Miss Sheckels on your mind,

11    for whatever reason.

12          MR. HIRSCHHORN:  Sorry, Judge.

13          THE COURT:  Miss Stevens, let me remind you that

14    you're still under oath.  I know that when we recessed on

15    Friday that Mr. Hirschhorn had indicated he had concluded his

16    direct.  He's advised me that he had two other areas that he

17    needed to go into.  So, Mr. Hirshfeld (sic), you may proceed.

18          MR. HIRSCHHORN:  I said Sheckels; you said

19    Hirshfeld.  We're even.

20          THE COURT:  Did I say Hirshfeld?  There is a Mr.

21    Hirshfeld.

22          MR. HIRSCHHORN:  He's coming, and there was a Miss

23    Sheckels.

24          THE COURT:  All right.

25

| 1 | KAY STEVENS, DEFENDANT WITNESS, PREVIOUSLY SWORN |
|---|---|
| 2 | CONTINUED DIRECT EXAMINATION |
| 3 | BY MR. HIRSCHHORN: |
| 4 | Q.   Miss Stevens, I think I asked you this.  Did you ever go |
| 5 | to any of the sober homes? |
| 6 | A.   No. |
| 7 | Q.   Okay.  All right.  As the ARNP, you indicated you had |
| 8 | the right -- you would look at the patient charts? |
| 9 | A.   Right. |
| 10 | Q.   Did you have the ability to go into what is known as the |
| 11 | CBS Lab reports to look at a patient's UA? |
| 12 | A.   Yes. |
| 13 | Q.   And you didn't have to go through the EMRs; you could do |
| 14 | that independently? |
| 15 | A.   Right. |
| 16 | Q.   And would you ever do that? |
| 17 | A.   Yes. |
| 18 | Q.   Why would you do that? |
| 19 | A.   To see the results of their urine or blood, because we |
| 20 | did blood and urine, so. |
| 21 | Q.   So there was nothing prohibiting you from doing that; |
| 22 | even if you didn't actually see the UA results in the EMR? |
| 23 | A.   Right. |
| 24 | Q.   When you saw a patient and you looked in the EMR and |
| 25 | didn't see a result of the lab test, would you go into that |

| | |
|---|---|
| 1 | patient's test results through the CBS portal? |
| 2 | A.   Yes.  I predominantly used the CBS portal; just to make |
| 3 | sure I was seeing the labs through CBS, in case it wasn't |
| 4 | downloaded into the EMR. |
| 5 | Q.   And if you saw something that was of concern to you, in |
| 6 | your professional capacity would you discuss it with the |
| 7 | patient? |
| 8 | A.   Yes. |
| 9 | Q.   And did you always note in the EMR record that you |
| 10 | discussed it, or were there times that, perhaps, you missed? |
| 11 | A.   Yes, I tried to remember.  But if I was swamped that day |
| 12 | and I just wanted to speak with the patient and find out, I |
| 13 | could have forgotten. |
| 14 | Q.   Okay.  Now, the CBS Lab results that you viewed, were |
| 15 | they always just urine tests; or did you ever review blood |
| 16 | tests? |
| 17 | A.   I would do blood and urine, but Dr. Snipes predominantly |
| 18 | did the blood labs. |
| 19 | Q.   Okay.  And is there -- you may have told us this; and if |
| 20 | you did, I won't ask -- is there a difference between how |
| 21 | long a drug stays in one's system -- evidence of a drug use |
| 22 | stays in one's urine versus how long evidence of that same |
| 23 | drug stays in one's blood? |
| 24 | A.   It's usually in the blood a little longer.  As far as |
| 25 | the specific time, I don't know. |

```
 1    Q.   Fair enough.  That's not your wheelhouse exactly.
 2    A.   So.
 3    Q.   Okay.  Did you ever yourself specifically order either a
 4    urine or a blood test of a patient?
 5    A.   Yes.
 6    Q.   And in doing so, why would you do that?
 7    A.   Usually whenever they're admitted, with them being on,
 8    you know, medications, we order a complete set of blood labs,
 9    unless -- you know, there were situations, if they brought it
10    in from detox and we had them available, I wouldn't reorder
11    them; but otherwise, that was part of the admission process.
12    Q.   Would you reorder them if they were stale?
13    A.   If they were what?
14    Q.   Stale; outdated.
15    A.   Oh, yes.  Yes.
16    Q.   Okay.  And were you responsible for ordering which kind
17    of tests to use, or was there a standard protocol?
18    A.   There was a standard protocol.
19    Q.   And who was it that selected the, as far as you know,
20    the protocol to be used for blood or urine testing?
21    A.   That I do not know.  The protocol was already there when
22    I was hired, and I just continued with that; as long as it
23    was everything that I needed.  Yeah, it was already done
24    prior to me coming.
25    Q.   You didn't make that decision on whether it was a --
```

1    there's different panels, right?

2    A.   Right.

3    Q.   12 panel?

4    A.   12 panel is usually the urine cup that they can see

5    immediately before it's sent to the lab.

6    Q.   And the more sophisticated and, unfortunately, more

7    expensive, how many panels would that be?  Do you know?

8    A.   The complete blood count set that we would order?

9    Q.   Right.

10   A.   I do not know.

11   Q.   Okay.  But why would you be interested, if you were, in

12   a particular test that had more than just the 12 panel?

13   A.   I mean as far as the blood labs, you need to look at,

14   you know, the -- just the regular blood, all the

15   electrolytes, all the medications.  You know?  The drugs that

16   they have abused, things they've relapsed, like that,

17   thyroid.  There's just so many things you need to look at to

18   make sure that everything's, you know, smooth with them.

19         So as far as the panel, it's just -- it's just what

20   you need to see in order to make sure that, you know, they're

21   healthy and you don't need to, you know, replace something or

22   add something or whatever.

23   Q.   So you're looking to see, perhaps testing for more, in a

24   more sophisticated -- more things in a more sophisticated

25   test?

1    A.   No, we didn't do -- we didn't go more in-depth.  The

2    things that I would look at, maybe I needed to prescribe a

3    medication, you know, or maybe, you know, they needed fluids

4    or, you know, whatever.  Basically make sure that they are

5    okay.  You know?

6              They've been through the drug abuse; they've

7    relapsed.  They've gone to detox.  You know?  They've come to

8    us, really, just to make sure they're stable.

9    Q.   As an ARNP, are you ever concerned about what -- and if

10   this isn't the right term, you'll tell me -- are you ever

11   concerned about the potential synergistic effect between one

12   drug being prescribed and another drug being prescribed or

13   taken?

14   A.   Yes.

15   Q.   Explain that, please, to the jury.

16   A.   Just making sure that there's no interactions and

17   everything is not -- there's -- I guess side effects, you

18   know, is the biggest thing you want to look for, to make sure

19   that everything is not -- because you have some that

20   antagonize the other, things like that.

21   Q.   If you have two drugs that are being prescribed and they

22   antagonize each other, could that have an adverse effect on

23   the patient?

24   A.   Yes.

25   Q.   And do you try to avoid that?

```
 1    A.    Yes.
 2    Q.    All right.  So would you agree or disagree that urine
 3    and blood tests are medically necessary?
 4    A.    Yes.
 5    Q.    And would you agree or disagree it's -- they become
 6    useful when used?
 7    A.    Yes.
 8    Q.    Meaning reviewed and transferred?
 9    A.    Right.  Yes, absolutely.
10          MR. HIRSCHHORN:  May I have a moment, please, Your
11    Honor?
12          THE COURT:  Yes, sir.
13    BY MR. HIRSCHHORN
14    Q.    I had a note that I checked off, but I might have missed
15    asking the question.
16          Did you maintain what is known as a medication
17    destruction log?
18    A.    Yes.
19    Q.    And what was that?
20    A.    It was the pharmacy guy.  I cannot remember his name at
21    this point.
22    Q.    Does the name Rick Halprin sound familiar?
23    A.    Yes.  Yes.  Rick, he sort of, I guess, oversaw
24    everything as far as the logbook that we had when we
25    destroyed the medications or the girls did.  I didn't
```

1    actually do it myself all the time, but we had to record it

2    in the logbook of how much was destroyed, how much -- because

3    of the patients moving in and out so quickly, we had to keep

4    track of all the medications in that person's name, so we had

5    a logbook that we did that.

6    Q.   So if Joel Hirschhorn moves in and at the time I move in

7    I have a prescription for, let's say, Adderall, and I'm there

8    and I'm supposed to take it once a day and I'm there for

9    three days and I move out and the prescription has 27

10   Adderall left, what do you do with it?

11   A.   If it's controlled, yes, it's destroyed.

12   Q.   You enter it into the log?

13   A.   Yes.

14   Q.   And then you destroy it how?

15   A.   I can't remember what it's called.  It's the bottles

16   that you put the pills in that -- I can't remember the name

17   because I don't do that right now, so.

18   Q.   But you see to it that those pills are no longer useful

19   or usable?

20   A.   Yes.

21   Q.   And then you enter it into a log?

22   A.   Yes.

23   Q.   And then Mr. Halprin would come inspect the log?

24   A.   Yes.

25   Q.   Did you ever give any leftover pills -- I think you

1    already said you would never do that, but did you ever give

2    any leftover pills?  Let's say I moved out and I left my

3    Adderall and some other patient comes in and needs Adderall

4    but doesn't have it, did you ever give it to the second

5    patient?

6    A.    No.

7    Q.    It's inappropriate?

8    A.    Yes.

9    Q.    Below the standard of care?

10    A.    Absolutely.

11    Q.    And would you ever entrust to even a house manager,

12    someone who is a recovering addict, any medication that was

13    destined for destruction?

14    A.    I'm sorry, repeat that.

15    Q.    Let's assume that I seem to be drug free; I'm a

16    recovering addict.

17    A.    Okay.

18    Q.    But you have medication that's earmarked for destruction

19    because the patient moved out and left it.  All right?

20          Would you ever entrust that leftover medication,

21    which was destined for destruction, would you entrust it to

22    someone who was a recovering addict -- such as a house

23    manager, for example -- to destroy it?

24    A.    I mean I never came across that.

25    Q.    Okay.  But if that was done, you would agree that would

```
1    not be the best decision?
2    A.   Yes.  No, it would not be the right thing to do.
3    Q.   It would be poor judgment?
4    A.   Oh, yeah.
5              MR. HIRSCHHORN:  No further questions.  Thank you.
6              THE COURT:  All right.  Cross-examination.
7              MR. CLARK:  Yes, please, Your Honor.  Good morning,
8    ladies and gentlemen.
9              THE JURY:  Good morning.
10             MR. CLARK:  Welcome back.
11                     CROSS-EXAMINATION
12   BY MR. CLARK:
13   Q.   Miss Stevens, it's not Dr. Stevens; right?
14   A.   Correct.
15   Q.   You are an ARNP?
16   A.   Yes.
17   Q.   And prior to coming to Florida, you lived in Georgia?
18   A.   Yes.
19   Q.   And in Georgia you were working as an ARNP for a
20   cardiovascular physician?
21   A.   Well, that wasn't my most recent, but yes, that was one
22   of them.
23   Q.   Now, in getting your ARNP, that required you to not only
24   have your college degree, your bachelor's degree in nursing,
25   correct?
```

1  A.   Yes.

2  Q.   But then you did some postgraduate work, and you

3  obtained a master's degree in nursing?

4  A.   Yes.

5  Q.   And I take it you had to take some certification; some

6  tests in order to qualify as a certified ARNP in Georgia?

7  A.   Yes.

8  Q.   And then when moving to Florida, you had to reapply and

9  go through the process to be certified in this state?

10  A.   Correct.

11  Q.   And they had the same requirements that they had in

12  Georgia?

13  A.   Yes.  Some of the Florida laws are different than

14  Georgia laws as far as practicing, but yes.

15  Q.   So you complied with the Florida laws, and you did some

16  training, I suppose online training, in order to --

17  A.   Yes.

18  Q.   -- prepare for the ARNP certification?

19  A.   Yes.

20  Q.   And you obtained your ARNP in the state of Florida in

21  2017?

22  A.   Yes, sir.

23  Q.   You did not get any special certification or

24  classification, did you?

25  A.   I had to go through the -- that wasn't immediately, but

1    I went through the SAMSA for the Benzodiazapine.

2    Q.   For the DEA waiver?

3    A.   Right.  Right.

4    Q.   But you never obtained certification as an adult

5    psychiatric and mental health RN, did you?

6    A.   No.

7    Q.   And, in fact, when you were hired here in Florida at

8    Safe Haven, that was a substance abuse treatment center?

9    A.   Yes.

10   Q.   And that was in April 2017?

11   A.   Yes.

12   Q.   And when you were hired there, you had absolutely no

13   work or experience in psychiatric work or clinical work

14   having to do with substance abuse treatment?

15   A.   I did.  I worked part-time in Georgia at Coastal Harbor.

16   It was a psychiatric inpatient treatment center.

17   Q.   And how long did you work there?

18   A.   Probably three years, but it was part-time.  I worked,

19   like, two weekends a month, like Saturday and Sunday.

20   Q.   So, ma'am, you recall having been interviewed by the FBI

21   previously; have you not?

22   A.   Yes.

23   Q.   And they interviewed you on October 3, 2019?

24   A.   Yes.

25   Q.   And the agents who interviewed you are the two ladies

1    who are seated at counsel table?

2    A.   Yes.

3    Q.   Anna Beckley, with the FBI; Agent Ziemer, with Health

4    and Human Services?

5    A.   Yes.

6    Q.   And at that time when asked about your background, you

7    reported that at the time you worked at Safe Haven, you had

8    no experience in recovery and no background in substance

9    abuse.

10             Do you recall having been asked that and providing

11   that answer?

12   A.   Yes.

13   Q.   Was that your answer at the time, ma'am?  Yes or no?

14   A.   I don't recall exactly what I said.

15   Q.   Okay.  I just had asked you and said:  Did you tell the

16   agents at that time that when you began working at Safe Haven

17   in April 2017, you had no previous experience in recovery or

18   substance abuse.  And you said:  Yes, that's what I told

19   them.  Is that the case?  Is that what you told them?

20   A.   It could be what I told them.  I don't recall.  But

21   because that job was part-time, I probably didn't even think

22   about it at that point.

23   Q.   So it slipped your mind.  And you did tell the agents

24   what you believed to be the truth at the time; that you had

25   absolutely no background in substance abuse or in recovery at

```
 1    the time you were hired at Safe Haven?
 2    A.   I believe that I said in the addiction treatment centers
 3    in Florida, like the one at Safe Haven, like these.  I don't
 4    recall saying that I've never had any experience whatsoever.
 5    Q.   And having been hired at Safe Haven, did they run a PHP,
 6    IOP program?
 7    A.   Yes.
 8    Q.   And you worked there for some six months?
 9    A.   Yes.
10    Q.   And then in October 2017, you were let go by Safe Haven?
11    A.   Yes.
12    Q.   And then you were hired at Serenity Treatment Center in
13    January of 2018?
14    A.   Yes.
15    Q.   And the person who first interviewed you was Al Ahmed;
16    is that right?
17    A.   Yes.
18    Q.   And then the followup on your initial interview, Al
19    Ahmed and Sebastian Ahmed interviewed you?
20    A.   Correct.
21    Q.   And I assume that during the course of that interview
22    they asked about your background?
23    A.   Yes.
24    Q.   And you had told them from your perspective what you
25    wanted, and that was a specific salary?
```

```
 1    A.    Yes.
 2    Q.    And you had asked for $90,000 a year?
 3    A.    Yes.
 4    Q.    Which constituted a raise from what you were making at
 5    Safe Haven, which was some $85,000 a year?
 6    A.    No.  I started at Safe Haven for $90,000.  I had at Safe
 7    Haven 90,000 because that's what I was making in Georgia.
 8    Q.    You asked to be paid comparable to what you were being
 9    paid by Safe Haven?
10    A.    Yes.
11    Q.    And it was Al who mentioned to you that:  We're going to
12    hire you on a 90-day probationary period?
13    A.    Yes.
14    Q.    And then the defendant, Sebastian Ahmed, had asked if
15    you were familiar with having worked at a salary for 90 days
16    and then getting a full salary, correct?
17    A.    That is correct.
18    Q.    And it was your expectation that you would get a written
19    contract that would recognize that salary of $90,000 a year?
20    A.    I was told I was going to get a contract in 90 days,
21    yes.
22    Q.    Yes.  Sebastian Ahmed told you, you would get a contract
23    after 90 days?
24    A.    Yes.
25    Q.    And that you would be paid $90,000 a year?
```

1    A.    Yes.

2    Q.    And, in fact, you were never provided that contract,

3    despite what Sebastian Ahmed promised you?

4    A.    Correct.

5    Q.    And, as a matter of fact, you wound up getting paid less

6    than what you were making at Safe Haven; were you not?

7    A.    Yes.

8    Q.    Now, at the time you were hired, you were hired to be

9    "in charge" of the medical side of the house at Serenity

10   Treatment Center?

11   A.    Yes.

12   Q.    And despite the fact that you were being hired as the in

13   charge of medical, there was actually a physician, a medical

14   doctor who was on the payroll at Serenity Treatment Center

15   when you began working in January of 2018; was there not?

16   A.    Yes.

17   Q.    And that man is Dr. Frank Snipes?

18   A.    Correct.

19   Q.    And despite that Dr. Frank Snipes was on the payroll and

20   was working at Serenity Treatment Center, you were added by

21   the defendant?

22   A.    Yes.

23   Q.    And referring to Government's Exhibit 38, this reflects

24   your starting date, turning to the subsequent page, of

25   January 20th of 2018; is that correct?  I'm sorry,

1    January 1st of 2018.

2    A.   Wait.  That's my start date?

3    Q.   Yes.

4    A.   No.  My start date was January, like, 22nd or something

5    like that.

6    Q.   Okay.  So as far as the books were concerned of Serenity

7    Treatment Center, they had you down as having commenced work

8    or being hired January 1, 2018; but you recall having started

9    January 23, 2018?

10   A.   Yes.

11   Q.   And Dr. Snipes appears here as also working as of

12   January 1, 2018.  Do you see that?

13   A.   Yes.

14   Q.   And this -- the payroll records reflect how much you

15   were paid every two weeks, does it not?  Some $2,700?

16   A.   Yes.

17   Q.   And, in fact, this appears to be in alphabetical order.

18   So Frank Snipes appears above you, and he is being paid

19   $1,600 a month or every two weeks?

20   A.   Yes, I see that.

21   Q.   So despite the fact that Frank Snipes had a medical

22   degree and you had a ARNP degree -- forgive me saying a

23   lesser degree --

24   A.   Absolutely.

25   Q.   -- you were being paid significantly more than Frank

1    Snipes?

2    A.   He -- he was only there three days a week, but, no --

3    yes.  He wasn't full-time.

4    Q.   Not only wasn't he full-time, he didn't have the full

5    capacity that you would typically expect a medical director

6    would have at a substance abuse treatment center, did he?

7    A.   I don't know.

8    Q.   Well, Dr. Snipes, in fact, did not have a DEA license,

9    which would allow him to prescribe controlled substances, did

10   he?

11   A.   No.

12   Q.   And, in fact, he had lost his DEA license years earlier,

13   having improperly prescribed a controlled substance to a

14   patient that he didn't have a doctor-client relationship

15   with.

16   A.   Oh.

17   Q.   And for having done that, his license -- his ability to

18   prescribe or dispense controlled substances was taken away

19   from him.

20   A.   Okay.

21   Q.   Is that correct?

22   A.   I don't know.  I've never discussed that with him.

23   Q.   You knew he did not have a DEA license permitting him --

24   wait until I finish my question -- permitting him to

25   prescribe controlled substances?

```
1    A.   Yes, I knew that.
2    Q.   Now, at the time you began as an ARNP at Serenity
3    Treatment Center, it's required in the state of Florida that
4    you have a relationship with a supervising doctor; correct?
5    A.   Correct.
6    Q.   And who was that doctor who supervised you?
7    A.   Dr. Snipes and Dr. Hernandez.
8    Q.   Did Dr. Snipes prepare a written protocol that was filed
9    concerning the scope of your duties and responsibilities, as
10   well as his, pursuant to Florida law?
11   A.   Yes.
12   Q.   And did Dr. Hernandez have a protocol with you as well?
13   A.   Yes.
14   Q.   Were you working under the supervision of both doctors
15   at the same time, or did one precede the other?
16   A.   Both at the same time.
17   Q.   And Dr. Hernandez, was he at Safe Haven when you worked
18   there earlier?
19   A.   Yes.
20   Q.   Dr. Hernandez was not a person who was actually at
21   Serenity Treatment Center, was he?
22   A.   He came to the treatment center, but he wasn't there
23   full-time, no.
24   Q.   He wasn't there regularly, was he?
25   A.   I wouldn't say regularly.  Maybe a few times a month, a
```

1    couple times a month or something.

2    Q.   He didn't see patients on a regular basis at Serenity

3    Treatment Center, did he?

4    A.   No.

5    Q.   He didn't have a face-to-face relationship with these

6    patients who were attending Serenity Treatment Center to

7    get -- to enter into recovery?

8    A.   Probably not all of them.

9    Q.   As a matter of fact, has any patient that you spoke to

10   ever met with Dr. Hernandez?

11   A.   Yes, there have been some; not every one.

12   Q.   And, nevertheless, that's why you were operating under

13   his supervision; because in the state of Florida, you could

14   provide examinations and diagnoses and so forth pursuant to

15   the protocol that was in place with Dr. Hernandez?

16   A.   Correct.

17   Q.   And that's how you were functioning at the beginning of

18   January or January 23, 2018, through the duration of your

19   employment into 2019 at Serenity Treatment Center?

20   A.   Yes.

21   Q.   And I think it's without doubt that the patient

22   population at Serenity Treatment Center were individuals who

23   were suffering from substance abuse of one variety or

24   another?

25   A.   Yes.

1    Q.   And they were predominantly, if not exclusively, young

2    adults from the ages of 18 through their late 20's?

3    A.   Yes.

4    Q.   And mostly these young men and women were dealing with

5    issues having to do with opioid use, correct?

6    A.   Correct.

7    Q.   And there was a specific diagnosis for that; opioid

8    abuse disorder, is that correct?

9    A.   Opioid disorder, yes.

10   Q.   And that's what these individuals were prescribed with,

11   as having suffered from some drug addiction and dependency?

12   A.   Yes.

13   Q.   And you learned fairly quickly during your treatment of

14   these patients, is that these patients were coming directly

15   from detox centers; is that not the case?

16   A.   Yes.

17   Q.   And that they had only stayed at these detox centers

18   typically two to three days?

19   A.   Yes.

20   Q.   And they bypassed going to any type of residential

21   treatment program, did they not?

22   A.   I don't know if they bypassed it or not.  I would just

23   get them from detox.

24   Q.   Well, if they were coming directly from detox, that

25   means they did not go to residential treatment after leaving

1    detox?

2    A.   Right.

3    Q.   And that's what you would recommend, is they go from

4    detox to residential, before going into an outpatient program

5    like Serenity?

6    A.   Yes.

7    Q.   And not only were they coming directly from detox, but

8    you found that it was inadequate that they were spending only

9    two or three days in detox?

10   A.   Yes.

11   Q.   You thought that the appropriate amount of time they

12   should spend in detox was some 14 days?

13   A.   At least.

14   Q.   So these patients were coming fresh off of drugs, fresh

15   off of detox, inadequate amount of detox in your opinion,

16   going directly to Serenity Treatment Center?

17   A.   Yes.

18   Q.   Did you have any say in the admission of these patients

19   directly from detox?

20   A.   No.

21   Q.   And I take it your opinion was that these patients were

22   not ready for an outpatient program?

23   A.   Some of them not.

24   Q.   And that proved to be the case; they were not ready for

25   this?

1    A.    Right.

2    Q.    Now, while you were at Serenity Treatment Center, do you

3    recall that there was a great push or initiative for

4    Sebastian Ahmed to obtain JCAHO or Joint Commission

5    Accreditation?  Is that right?

6    A.    Yes.

7    Q.    And he brought in a fellow named Jay Bouldin?

8    A.    Yes.

9    Q.    And Jay was a medical doctor?

10   A.    Yes, he was a medical doctor, but he didn't practice.  I

11   don't know that situation, but.

12   Q.    He had drug issues himself, so he was not a practicing

13   physician; is that right?

14   A.    I don't know that to be true, but.

15   Q.    And he kind of cleaned up things at Serenity Treatment

16   in the summer of 2018 to some extent, did he not?

17   A.    Yes.  He was great.

18   Q.    He was great.  He had a lot of positive energy?

19   A.    Yes.

20   Q.    He dealt well with the patients?

21   A.    Yes.

22   Q.    And he was good at organizing things at Serenity

23   Treatment, is that not right?

24   A.    Yes, correct.

25   Q.    And that was all part of getting ready for the JCAHO

```
 1    inspection?
 2    A.    Yes.
 3    Q.    But what we're talking about in getting things ready is
 4    cleaning up the facility, yes?
 5    A.    Just making sure everything is, you know, in compliance,
 6    by the book, all those things.
 7    Q.    That the paperwork was in order?
 8    A.    Yes.
 9    Q.    And he was doing something as far as cleaning up the
10    residences as well, was he not?
11    A.    That I don't know.  I don't have anything to do with the
12    residences.
13    Q.    Because you never went to the residences, you don't know
14    what was taking place at the residences?
15    A.    Right.
16    Q.    I'm sure the patients would confide in you though that
17    there was rampant drug use at the residences?
18    A.    No.
19    Q.    That there was unwanted sexual advances by the staff
20    members -- house managers with the female patients?
21    A.    I never heard any of that.
22    Q.    That there were constant overdoses taking place there?
23    A.    No, I never heard that.
24    Q.    So despite the fact that you had this relationship as a
25    care provider and a person overseeing the treatment from the
```

1    medical perspective of these patients, you never asked and

2    they never shared with you the horrors that were taking place

3    at the residences?

4    A.   No.

5    Q.   Now, obviously these patients that you were overseeing

6    their care, they were still using drugs; were they not?

7    A.   We would have relapse, but they weren't continuously

8    using drugs.

9    Q.   Well, let me just show you as an example a series of

10   sheets that have been admitted in evidence.  Beginning with

11   Government's 46-F, these are patient sign-in sheets.  Are you

12   familiar with these?

13   A.   Yes, yes, yes.

14   Q.   And these were employed by Serenity to when patients

15   came, to sign in so there was some record of their

16   attendance; is that right?

17   A.   Yes.

18   Q.   And this particular sign-in sheet is dated August 7,

19   2018?

20   A.   Correct.

21   Q.   And this is during the period of time in which Jay was

22   there trying to cleanup Serenity for the anticipated JCAHO

23   accreditation?

24   A.   Yes.

25   Q.   And if you examine these patients, I don't know if you

```
1    recognize the names of these patients -- do you?
2    A.   Yes.
3    Q.   And these are all patients who you were treating, were
4    you not?
5    A.   Yes.
6    Q.   And there are some 45 to 50 names on these sheets,
7    correct?
8    A.   Yes.
9    Q.   Because that was the census of Serenity when you were
10   there; 45 to 50 patients?
11   A.   Yes.
12   Q.   And you're familiar with these various abbreviations for
13   illicit drugs, are you not?
14   A.   Yes.
15   Q.   So we see that practically everybody is testing positive
16   for marijuana or THC, correct?
17   A.   Yes.
18   Q.   And then we see Fentanyl.  That is an opiate or an
19   opioid?
20   A.   That's an opioid.
21   Q.   And cocaine and more Fentanyl and an opioid and
22   Fentanyl.  Bup, do you know what Bup stands?
23   A.   That's the Subutex.
24   Q.   And benzos I take it --
25   A.   Yes.
```

1    Q.   -- methamphetamine.  This particular person, do you

2    remember Felicia, who was testing positive for heroin,

3    cocaine, an opioid, and Fentanyl?

4    A.   Right.  It doesn't say on the sheet though whether she

5    could have just come to us from detox.  Sometimes it's still

6    in your system.  You know?

7    Q.   That's a pretty potentially lethal combination, isn't

8    it; heroin, cocaine, opioids, and Fentanyl?

9    A.   Yes.

10   Q.   And it seems upwards of 90 percent of these patients all

11   were testing positive, based upon their urine screens and

12   tests, with a number of serious hard-core drugs?

13   A.   Yes.

14   Q.   Do you agree with me?

15   A.   Yes.

16   Q.   And it was a recurring issue with these patients,

17   because on August 14th, Government's Exhibit 46-G, we see

18   similar results for the same patients, those who checked in;

19   correct?

20   A.   Yes.

21   Q.   As well as on the 21st.  So obviously these patients

22   were actively using drugs, both those that were prescribed

23   for them, as well as illicit, illegal drugs; is that correct?

24   A.   Yes, they tested positive for those; but it doesn't

25   always mean that they were using right then.

73

```
 1    Q.   Well, ma'am, when you were there, you would see these
 2    patients oftentimes were sleepy; did you not?
 3    A.   Were sleepy?
 4    Q.   Yes.  Patients who were passed out, who were nodding
 5    off, who were displaying symptoms that are consistent with an
 6    individual who --
 7    A.   If I -- I mean I didn't see very many people outside of
 8    my office.  Like I was busy all the time.  If they were
 9    sleepy in my office, then I would definitely check into it.
10    Q.   So referring to Government's 39-I, this particular
11    photograph taken at Serenity Treatment Center, if you had
12    seen an individual like that, you would probably call 911;
13    would you not?
14    A.   I -- right.
15    Q.   Because this person is evidencing signs that he's going
16    through respiratory arrest, and potentially could die?
17         MR. HIRSCHHORN:  Objection to the form of the
18    question.
19         THE COURT:  Overruled.
20    BY MR. CLARK:
21    Q.   Would that be your medical conclusion, based upon
22    witnessing this?
23    A.   No.
24    Q.   But you do believe he should seek medical help and
25    receive emergency medical services?
```

1    A.   That's when I would assess, do vitals, make sure he was

2    okay, those kinds of things.  But they were never like that

3    in my office.

4    Q.   So despite the fact that Dr. Jay Boulden was there to

5    clean things up, really all he was doing was attending to the

6    paperwork and making sure everything was in order

7    paperwork-wise?

8    A.   I'm not sure.

9    Q.   Well, ma'am, isn't it true that according to you, that

10   the quality of patient care did not change one iota, despite

11   Jay's presence there at Serenity Treatment Center?

12   A.   I never said that, because I thought it definitely

13   improved when he was there.

14   Q.   Well, again, you recall that interview that you had with

15   the agents on October 3, 2019?  Do you recall that interview?

16   A.   Yes.

17   Q.   And you did tell the agents:  He brought good energy and

18   was very good with the patients?

19   A.   Yes.

20   Q.   And that you do recall?

21   A.   Yes.

22   Q.   But you did tell the agents during that interview that:

23   The patient care did not change when he was there, however.

24   It felt like the facility was more organized.

25           That's the truth, is it not; that the patient care

1    did not change at all; that Jay Boulden made sure that the

2    JCAHO binders and paperwork were in place?

3    A.   I don't recall ever saying that because patient care

4    definitely improved.

5    Q.   So shortly after Jay Boulden and these positive tests

6    that we have just seen, I believe the next day, August 22,

7    2018, the FBI executed a search warrant at Serenity Treatment

8    Center; do you remember that?

9    A.   Yes.

10   Q.   I'm sure it stands out in your mind.

11   A.   Yes.

12   Q.   You never witnessed anything like that before?

13   A.   No.

14   Q.   And this entry into the premises occurred early in the

15   morning; approximately 9:00 A.M.?

16   A.   Yes, 9:00 A.M.  I didn't get there till, like, 9:30.  I

17   got there after they had like --

18   Q.   And you were able to witness some 25 to 30 federal

19   agents, all in their gear, coming into Serenity, engaging in

20   a search?

21   A.   Yes.

22   Q.   And I'm sure that caused you some concern.  This is out

23   of the ordinary that your medical place of business was just

24   raided by the FBI?

25   A.   Yes.

```
1   Q.   And despite the fact that the FBI came and raided the
2   premises, I'm sure you suspected --
3           You knew who the FBI were, did you not?
4   A.   Yes.
5   Q.   And you knew the FBI there were executing a warrant that
6   had been approved by a United States federal magistrate
7   judge?
8           MR. HIRSCHHORN:  Objection, Judge.  Move to strike.
9   Request a sidebar.
10          THE COURT:  That request will be granted regarding
11  the magistrate.  Please disregard that.
12  BY MR. CLARK:
13  Q.   You didn't question the authority of the FBI being there
14  that day, did you?
15  A.   Yes.
16  Q.   You did.  Who did you raise that to?
17  A.   We had meetings after the FBI left, the next day or
18  whatever, and we were reassured that, you know, they hadn't
19  done anything wrong.
20  Q.   And who told you they had done nothing wrong?
21  A.   Al and Sebastian.
22  Q.   So they said:  Don't worry about the FBI raiding us.
23  We're running a good establishment here.  There is no cause
24  for concern to you?
25  A.   Yes.
```

1    Q.   And you accepted the representations made by Al and

2    Sebastian?  You continued to work there?

3    A.   Yes.

4    Q.   And you continued to work there another eight,

5    nine months, did you not?

6    A.   Yes.

7    Q.   Now, it was only in June of 2018, June 14th to be

8    specific, when you obtained your license with the DEA to

9    prescribe controlled substances?

10   A.   Yes.

11   Q.   And when we're talking about controlled substances,

12   we're talking about those drugs that the government has seen

13   fit to designate as the types of drugs that need to be

14   restricted; correct?

15   A.   Yes.

16   Q.   They need to be restricted because there is a potential

17   of abuse associated with these drugs?

18   A.   Yes.

19   Q.   And they require a qualified individual to prescribe

20   these types of drugs for these patients?

21   A.   Yes.

22   Q.   Pursuant to a valid diagnosis?

23   A.   Yes.

24   Q.   A genuine need, a therapeutic need to use these drugs in

25   order to overcome some type of symptoms or condition that

1    these patients suffer from?

2    A.   Yes.

3    Q.   And in prescribing these drugs, it requires a one-on-one

4    interview of the patient?

5    A.   Yes.

6    Q.   And they have to provide a history to the provider?

7    A.   Right.

8    Q.   And they have to submit themselves to a physical

9    examination by a qualified individual?

10   A.   Yes.

11   Q.   And then you're the type of individual who can do those

12   types of exams, can you not?

13   A.   Correct.

14   Q.   In the state of Florida, a physician, a physician's

15   assistant, an ARNP can conduct a physical examination of a

16   patient?

17   A.   Yes.

18   Q.   And you, as an ARNP, can diagnose that patient?

19   A.   Yes.

20   Q.   And then you can prescribe therapy, you can prescribe

21   medications, whatever you think is appropriate for that

22   particular patient?

23   A.   Yes.

24   Q.   And it's supposed to be unique, right?  Every patient is

25   different?

1    A.    Yes.

2    Q.    That's the purpose in conducting a history of the

3    patient and a background of the patient, to make sure that

4    the type of treatment and medication you're prescribing is

5    appropriate for that patient?

6    A.    Correct.

7    Q.    And after prescribing that patient with medications,

8    let's say, you're to monitor how they're doing with those

9    drugs, medications, therapies?

10   A.    Yes.

11   Q.    And one would anticipate that you would look to see

12   whether the patient is improving, correct?

13   A.    Correct.

14   Q.    And if they're improving, it would be within the

15   standard of care of a provider like yourself to reexamine

16   whether or not these patients should continue to be

17   prescribed these potentially dangerous drugs that are

18   controlled by the Drug Enforcement Administration?

19   A.    Yes.

20   Q.    And you do that on a consistent basis every time you

21   review a patient's file or meet with a patient personally?

22   A.    Yes.

23   Q.    Now, among the types of drugs that you were prescribing

24   were drugs that fall within the category of psychotropic

25   drugs; is that correct?

```
 1    A.   Yes.
 2    Q.   And these are the type of mood-altering drugs that can
 3    affect behavior and thoughts or perception?
 4    A.   Yes.
 5    Q.   And they are drugs that, as I said previously, can be
 6    misused or abused by the patients; and that's why they're
 7    controlled by the federal government, correct?
 8    A.   Yes.
 9    Q.   And among those drugs that you were prescribing for
10    these patients, were Benzodiazepine drugs; correct?
11    A.   Yes.
12    Q.   And Benzodiazepines are sedation-type drugs, are they
13    not?
14    A.   Yes.
15    Q.   And these are pretty serious drugs?
16    A.   Yes.
17    Q.   And they have a great potential for dependency?
18    A.   Yes.
19    Q.   And once dependent, the withdrawal from Benzodiazepines
20    is as severe, if not more severe, than the withdrawal from
21    heroin let's say?
22    A.   It's possible.
23    Q.   And these drugs -- these Benzodiazapines have side
24    effects, do they not?
25    A.   Yes.
```

1    Q.   And the side effects are that they depress the central

2    nervous system?

3    A.   Yes.

4    Q.   And they slow down a person's metabolism?

5    A.   Yes.

6    Q.   And they may be habit forming if they are used for an

7    extended duration of time?

8    A.   Can I say one thing?  During this -- that August I was

9    not prescribing those medications.

10   Q.   No.  It wasn't until September of 2018 that you were

11   actually prescribing these drugs.

12   A.   It was after October.  It was after Moe left.

13   Q.   But you're familiar with these drugs?

14   A.   Yes.

15   Q.   And these were the types of drugs that other providers

16   were prescribing for the patients under your care, yes?

17   A.   Yes.

18   Q.   And as part of this protocol with Dr. Hernandez, you and

19   he both share equal responsibility, as far as the conduct of

20   a patient's treatment and care; do you not?

21   A.   Yes.

22   Q.   He is ultimately responsible for what you do?

23   A.   Yes.

24   Q.   But you are responsible as well?

25   A.   Yes.

82

1   Q.   So this is a matter of your concern as to what the

2   patients under your care and responsibility are being

3   prescribed?

4   A.   Yes.

5   Q.   And you were fully aware, both before and after you got

6   your DEA license, of the risks associated with Benzodiazepine

7   use?

8   A.   Yes.

9   Q.   And, as a matter of fact, the Federal Drug

10  Administration has issued a Black Box Warning concerning

11  these Benzodiazepine drugs?

12  A.   Yes.

13  Q.   And could you share with us what a Black Box Warning is?

14  A.   That it has potential for death.

15  Q.   And the risk of death is particularly serious if you mix

16  these Benzodiazepines with other opioid-type drugs, correct?

17  A.   Correct.

18  Q.   And those other opioid drugs would include heroin, yes?

19  A.   Yes.

20  Q.   Fentanyl?

21  A.   Fentanyl.

22  Q.   Buprenorphine?

23  A.   Yes.

24  Q.   As well as alcohol?

25  A.   Yes.

83

```
 1    Q.   So patients on Benzodiazepines, who are combining them
 2    with opioids or alcohol, run a severe risk of dying as a
 3    result of that?
 4    A.   Yes.
 5    Q.   And yet that's what these patients were being
 6    prescribed?  Known drug abusing opioid users were being
 7    prescribed opioids --
 8    A.   Yes.
 9    Q.   -- under your care?
10    A.   Yes.
11    Q.   And the diagnosis for these patients being prescribed
12    these very dangerous Benzodiazapine drugs was anxiety, was it
13    not?
14    A.   Yes.
15    Q.   And there is a specific condition referred to as general
16    anxiety disorder?
17    A.   Yes.
18    Q.   And there is specific criteria that have to be met in
19    order to qualify for general anxiety disorder?
20    A.   Yes.
21    Q.   And these young people, age 18 to their later 20's, who
22    were receiving Benzodiazepines, were doing so under the idea
23    that they were suffering from anxiety?
24    A.   And withdrawals, yes.
25    Q.   You're familiar with the fact that the first-line
```

1    treatment for anxiety is not Benzodiazepines, correct?

2    A.   Yes.

3    Q.   The first-line treatment would be an antidepressant,

4    correct?

5    A.   Yes.

6    Q.   Prozac?

7    A.   Yes.

8    Q.   Lexapro?

9    A.   Yes.

10   Q.   But these patients weren't being prescribed with the

11   first-line treatment, were they?

12   A.   They were -- they were weaning from the benzos to start

13   those; or sometimes they were, you know, already taking that

14   for the withdrawal symptoms coming from detox.

15   Q.   Well, then they shouldn't be coming to your center.

16   A.   And I would wean them down, wean them off, you know.

17   Q.   So by weaning these patients off, that means that over a

18   period of time, you prescribed lower and lower dosages for

19   these patients?

20   A.   Yes.

21   Q.   And eventually you discontinued the prescription for

22   benzos for these patients, because they no longer require

23   them?

24   A.   Yes, that was the goal.

25   Q.   That was the goal; but was that the practice?

1    A.   It was the practice.  But did it happen with every
2    patient?  Absolutely not.
3    Q.   Did it happen with any patients?
4    A.   Yes.
5    Q.   Which patients?
6    A.   I don't know their names, but yes.
7    Q.   Now, in addition to the Benzodiazepine drugs, there were
8    other psychotropic drugs that were being prescribed for these
9    patients; were there not?
10   A.   Yes.
11   Q.   And that would include Seroquel?
12   A.   Yes.
13   Q.   And what's the chemical name for Seroquel?  Ketamine?
14   A.   Yes.
15   Q.   And that too has serious side effects, doesn't it?
16   A.   Yes.
17   Q.   And the Seroquel is actually a drug that should be
18   prescribed for somebody who is suffering from a severe mental
19   disorder; like bipolar or schizophrenia?
20   A.   Yes.
21   Q.   Instead, these patients, who are dealing with opioid
22   recovery and opioid abuse, were being prescribed Seroquel?
23   A.   Yes.  And I would get them off of Seroquel as soon as
24   possible.
25   Q.   You disagreed with the treatment plan that was adopted

1    by Dr. Hernandez in prescribing Seroquel for these opioid

2    users?

3    A.    No.   When they would come from detox and they were on

4    high doses of Seroquel, I would lower their doses; and then

5    within a few weeks, try to get them on something different.

6    I would speak with Dr. Hernandez about it, but yes.

7    Q.    But you were responsible?

8    A.    Yes.

9    Q.    Whether you thought it was a good idea or not, you were

10   endorsing his treatment plan by signing off on the various

11   notes and follow-ups with these patients?

12   A.    Yes.

13   Q.    You stood in the same shoes as Dr. Hernandez?

14   A.    Yes.

15   Q.    Nobody required you to prescribe this protocol that Dr.

16   Hernandez may have recommended?

17   A.    I'm sorry?

18   Q.    You weren't required to follow that protocol if you

19   disagreed with it, did you?

20   A.    Seroquel, I agreed with him that I would follow his

21   protocol; but then if I had a question, I would call him; or

22   whenever he came in, we would have a discussion; it may be on

23   a particular patient.

24   Q.    Like the benzos, the Seroquel has the same type of

25   serious level of abuse; does it not?

```
 1    A.   I -- I would say no.
 2    Q.   Well, as a matter of fact, there is a Black Box Warning
 3    that accompanies every prescription for Seroquel; isn't
 4    there?
 5    A.   I don't recall.
 6    Q.   Well, ma'am, there is, and it's because --
 7              MR. HIRSCHHORN:  Objection.  Counsel is testifying
 8    to matters not in evidence.
 9    BY MR. CLARK:
10    Q.   Isn't it incumbent upon you, as an ARPN, who is
11    overseeing the prescriptions and later -- let me take that
12    back.
13              Seroquel is not a controlled substance, is it?
14    A.   No.
15    Q.   So you could prescribe for it?
16    A.   Yes.
17    Q.   And you did prescribe for it?
18    A.   Yes.
19    Q.   And isn't it incumbent upon you, as a prescribing ARPN,
20    to know whether or not Seroquel has a Black Box Warning
21    because of its serious side effects?
22    A.   Yes.
23    Q.   But you did not?
24    A.   I would get people off of Seroquel.
25    Q.   That's not the question, ma'am.  I said:  Were you
```

```
 1    familiar with the fact that the FDA issued a Black Box
 2    Warning because of the serious level of abuse and side
 3    effects for Seroquel?
 4              MR. HIRSCHHORN:  Object to the form of the
 5    question.
 6              THE COURT:  Overruled.
 7    BY MR. CLARK:
 8    Q.   You may answer.
 9    A.   No.
10    Q.   And you're also aware that Seroquel is the kind of drug
11    that people who are involved in drug abuse often abuse and
12    sell on the street, correct?
13    A.   No.
14    Q.   You weren't aware of the fact that there is a high
15    diversion risk with Seroquel?
16    A.   No.
17    Q.   That there was a demand on the street for persons with
18    Seroquel --
19    A.   No.
20    Q.   -- because it gives you a high?
21    A.   Never.
22    Q.   You're also familiar with Gabapentin, are you not?
23    A.   Yes.
24    Q.   And that was a prescription pain killer?
25    A.   No, it's -- it's for -- it's -- no.  It's for nerves,
```

1   like neuralgia.  I mean it's used for pain, but not like a

2   pain medicine; like your typical Percocet or whatever.  It's

3   not controlled.

4   Q.   Well, it's used for epilepsy; right?

5   A.   Yes.

6   Q.   And it's used for neuropathic pain?

7   A.   Yes.

8   Q.   And like Seroquel, like benzos, Gabapentin also is

9   abused by patients who are already involved in drug abuse?

10  A.   Yes.

11  Q.   And it has a high calming effect on the patients; and,

12  therefore, it makes it desirable on the street?

13  A.   I have no idea.

14  Q.   And you mentioned it's for neuropathic pain.  So for a

15  patient to present for or to qualify to receive a

16  prescription for Gabapentin, they'd have to report some sort

17  of neurological damage; is that right?

18  A.   A lot of it is related to withdrawal symptoms.  They get

19  the neuralgias in their legs, and that's what it's prescribed

20  for.

21  Q.   And that can be diagnosed?  You can look at a patient,

22  you can perform neurological tests of the patient, and you

23  can determine whether or not they're legitimately

24  experiencing any kind of foot pain or leg pain as a result of

25  their withdrawal?

```
 1    A.    Yes.

 2    Q.    And prior to prescribing Gabapentin for these types of

 3    patients, you'd have to make careful examination to see

 4    whether or not this patient really had nerve pain, versus

 5    this patient is just using that as an excuse in order to get

 6    a drug that he could use to get high or sell on the street?

 7    A.    Yes.

 8    Q.    And that's your responsibility as a prescribing ARNP?

 9    A.    Yes.

10    Q.    Now, ma'am, you acknowledge that you prescribed

11    Benzodiazepine drugs; do you not?

12    A.    Yes.

13    Q.    And anti-psychotics like Seroquel?

14    A.    Yes.

15    Q.    And these drugs, ma'am, are required to be prescribed by

16    only an ARNP who has a psychiatric certification that we

17    previously discussed; is that not correct?

18    A.    No, that's not correct.

19    Q.    So, ma'am, just so we're clear, the psychiatric nurse is

20    somebody who has the doctoral degree, a master's degree in

21    psychiatric nursing; correct?  Yes?

22    A.    Yes.

23    Q.    And you've obtained some sort of advanced practice

24    certification as a psychiatric mental health advanced

25    practical nurse, correct?
```

91

1    A.    (Nodding)

2    Q.    And has two years of post-master's clinical experience

3    under the supervision of a physician, correct?

4    A.    Yes.

5    Q.    And pursuant to Florida Statute 394.455:  A psychiatric

6    nurse and working within the framework of a protocol with a

7    psychiatrist can prescribe psychotropic controlled substances

8    for the treatment of mental disorders; correct?

9    A.    I don't know what you're reading, but.

10   Q.    Would you like to see it?

11   A.    Sure.

12          MR. HIRSCHHORN:  This is a proposed bill you just

13   handed me.

14          MR. CLARK:  It is a proposed bill.  I will provide

15   you with the actual statute.

16          MR. HIRSCHHORN:  Yes, please.

17          MR. CLARK:  I am handing Mr. Hirschhorn the

18   document to take a look at that.

19   BY MR. CLARK:

20   Q.    So, ma'am, you were not familiar with that law that only

21   allows psychiatric ARNPs to prescribe psychotropic

22   substances?

23   A.    No, not at all.

24   Q.    Now, in addition to having obtained your DEA license in

25   June of 2018, you also obtained your data waiver with the

```
1    Drug Enforcement Administration?
2    A.   It's called what?
3    Q.   The data waiver.  You got the ex; exclusion from the
4    Controlled Substances Act allowing you, as an ARNP operating
5    under the supervision of a psychiatrist, to prescribe
6    Buprenorphine?
7    A.   Yes.  The course that I took, yes.
8    Q.   And you had to attend an online course, or did you do it
9    in person?
10   A.   Online, through SAMSA.
11   Q.   And SAMSA is the organization that oversees the
12   administration of drug treatment; the Substance Abuse and
13   Mental Health Administration?
14   A.   Yes.
15   Q.   And this medication, Buprenorphine, is a substance that
16   is an opioid; is it not?
17   A.   Yes, it's a low dose.
18   Q.   And it is used specifically to treat opioid use
19   disorder?
20   A.   Yes.
21   Q.   And this is the type of substance that's approved by the
22   FDA, and should be used in conjunction with therapy and
23   counseling services?
24            MR. HIRSCHHORN:  Is that a question?
25            MR. CLARK:  Yes.  They're all questions.
```

93

```
 1    BY MR. CLARK:
 2    Q.   Is that a fact, ma'am?  You use Buprenorphine as a
 3    therapy tool, in addition to counseling and behavioral
 4    therapies?
 5    A.   Disagree.
 6    Q.   It's part of the whole package?
 7    A.   Yes.
 8    Q.   You don't rely on Buprenorphine alone in order to assist
 9    individuals in overcoming their dependency and addiction to
10    opioids?
11    A.   Right.
12    Q.   And the only persons who can prescribe Buprenorphine are
13    physicians and mid-level practitioners, such as yourself, who
14    obtain this waiver or exemption --
15    A.   Yes.
16    Q.   -- from the DEA laws?
17              Now, Buprenorphine is an opioid.  We have already
18    established that.
19    A.   Yes.
20    Q.   And persons can get high from Buprenorphine?
21    A.   Yes.
22    Q.   But it's limited.  They can only get so high?
23    A.   And then you can use one that's got the blocker.
24    Q.   Yes, you can.  There are two types?
25    A.   Yes.
```

1    Q.    Now, when we're just talking about Buprenorphine alone,

2    that's the mono product; is it not?

3    A.    Yes.

4    Q.    And in that pure form, it is an opioid; and persons who

5    are drug abusers, can take that Buprenorphine and crush it

6    and inject it and get a heroin-like high, can they not?

7    A.    Yes.

8    Q.    So there is a diversion potential that persons can

9    either abuse this drug individually or give it to somebody

10   else to get high like they would be if they were using

11   heroin, correct?

12   A.    Yes.

13   Q.    And it is an agonist, is it not; an opioid partial

14   agonist?

15   A.    Yes.

16   Q.    And if you combine Buprenorphine with other opioid drugs

17   --

18         You mentioned the synergistic effect before, didn't

19   you?

20   A.    Right.

21   Q.    So if you combine Buprenorphine with heroin or with

22   Fentanyl, you can get even much higher if you were a drug

23   abuser; is that correct?

24   A.    I don't recall, but.

25   Q.    Well, you talked about the synergistic effect with Mr.

1    Hirschhorn?

2    A.   Right.  There is an effect.  I've never had a patient

3    come to me that had done that, so.

4    Q.   Well, do you agree with that if you take Buprenorphine

5    and add it to another opioid, you're not just doubling the

6    effect of the drug, but you geometrically expand the effects

7    of the drugs?

8    A.   Yes.

9    Q.   And because of the fact that Buprenorphine is abused in

10   such a way, it is medically recommended -- and you learn this

11   from SAMSA -- to use the combo product; not the pure

12   Buprenorphine?

13        MR. HIRSCHHORN:  Object to the form of the

14   question, Your Honor, and the drama that's associated with

15   looking at the jury while the question is being posed to the

16   witness over here.

17        THE COURT:  Overruled.

18   BY MR. CLARK:

19   Q.   Buprenorphine is referred to as Subutex, correct?

20   A.   Yes.

21   Q.   And it's recommended, based upon your training by SAMSA,

22   that you use the combo form, isn't that true?

23   A.   Yes.

24   Q.   And the combo form takes the opioid, Buprenorphine, and

25   adds to it Naloxone?

1    A.   Yes.

2    Q.   And Naloxone is an antagonist; it works opposite of the

3    opioid, correct?

4    A.   Yes.

5    Q.   And Naloxone, that actually appears in that spray called

6    Narcan; does it not?

7    A.   Yes.

8    Q.   And Narcan is used to inject intranasally in the nose of

9    a person who is suspected to be overdosing on opioids,

10   correct?

11   A.   Correct.

12   Q.   And it is because this has an opposite effect; that you

13   can apply Narcan to a person on a heroin or an opioid

14   overdose in order to revive them?

15   A.   Yes.

16   Q.   Now, you would agree that a person who is overdosing on

17   opioids, really needs to see emergency medical care or

18   receive emergency medical care; do you not?

19   A.   Absolutely.

20   Q.   And it would be reckless, highly irresponsible, if not

21   criminal, for a provider to refuse emergency services for a

22   person suspected of a drug overdose?

23   A.   Yes.

24   Q.   And even if they are Narcaned by somebody who happens to

25   have Narcan on the scene, still the EMTs, 911, should respond

1    in order to treat that person?

2    A.   Yes.

3    Q.   Now, the way the Buprenorphine with the Naloxone

4    combined, there is a name for that; isn't there?  We've

5    referred to it as combo product, but the brand name is

6    Suboxone; is that not correct?

7    A.   Yes.

8    Q.   And this combo product prevents the users from grinding

9    it up and injecting it, is that not true?

10   A.   It doesn't prevent them from doing anything.

11   Q.   Well, if they do it, they're not going to get high, for

12   one, because of the effect of the Naloxone?

13   A.   Precipitates withdrawals also.

14   Q.   So if your desire is to get high, you're not going to

15   get high by injecting Suboxone; correct?

16   A.   I do not know personally.

17   Q.   You took the SAMSA course, didn't you?

18   A.   Yes.

19   Q.   You've been working in substance abuse treatment

20   centers, haven't you?

21   A.   Yes.

22   Q.   And this is your job for the last two years, is dealing

23   with this type of patient population?

24   A.   Yes.

25   Q.   And you don't know that patients are less likely to

1    abuse Suboxone because of the very reasons I just presented
2    to you?
3    A.   Yes.  But they will do whatever they -- it doesn't
4    matter; whether it's Suboxone or Subutex, whatever they think
5    they might can get a little bit of a high, they do it.
6    That's just that population.
7    Q.   Well, this population knows a thing or two about getting
8    high; don't they?
9    A.   Yes.
10   Q.   And they're not going to knowingly inject something
11   that's not going to get them high and make them sick, will
12   they?
13   A.   Yes, they will.  That's what I'm saying, like --
14   Q.   Well, ma'am --
15   A.   Sometimes they don't care about the consequences, I
16   guess, is my point.
17   Q.   Well, the fact is, ma'am, that the medical establishment
18   who specializes in this area, like SAMSA and other
19   knowledgeable physicians and psychiatrists in substance
20   abuse, they prescribe the combo product Suboxone in order to
21   avoid abuse by the patients; do they not?
22           MR. HIRSCHHORN:  Object to the form of the
23   question, Your Honor.
24           THE COURT:  Sustained.
25   BY MR. CLARK:

1    Q.   Ma'am, when prescribing Buprenorphine, it's like the

2    other drugs you described; correct?

3    A.   I'm sorry, what was the question?

4    Q.   It's similar to the other Benzodiazepines and Seroquel

5    and other psychotropic drugs that you described; that the

6    idea is to treat a patient initially with the drug during the

7    induction phase, and see how they fair?

8    A.   Then decrease the dosage, yes.

9    Q.   And during the stabilization phase, over a period of

10   time, they will become accustomed to that drug and require

11   less and less of it?

12   A.   Yes.

13   Q.   Then you taper them off over the course of their

14   treatment, and eventually they may need it less; if at all?

15   A.   Yes.

16   Q.   That's the goal of the treatment?

17   A.   Yes.

18   Q.   Now, ma'am, despite the side effects and the various

19   issues that arise combining the use of opioids like

20   Buprenorphine or heroin or Fentanyl with Benzodiazepines, you

21   yourself, ma'am, prescribed both those once you obtained your

22   DEA waiver; did you not?

23   A.   Yes.

24   Q.   And in the period of September 24, 2018 -- I think you

25   had just gotten your DEA waiver to prescribe Buprenorphine,

1    until the end of your employment with Serenity in March of

2    2019, you saw the patients at Serenity Treatment Center and

3    you were prescribing for those patients?

4    A.   I thought it was after October, but yes.

5    Q.   And during the period of time, patients would come to

6    you, patients who were being treated at Serenity, and they

7    would report to you that they were suffering from opioid use

8    disorder?

9    A.   Yes.

10   Q.   And you would then prescribe for them the safer version

11   of the Buprenorphine, the combo product, so that they would

12   not abuse the drug; correct?

13   A.   If they could tolerate it.

14   Q.   Well, the only persons who can't tolerate the

15   combination product would be those -- would be pregnant

16   women; correct?

17   A.   Yes.

18   Q.   Or persons who are allergic to the component, Naloxone;

19   correct?

20   A.   Yes.  Some people experience nausea, and so they can't

21   take it either, so.

22   Q.   But you would have to make a professional determination,

23   based upon your observations, your interview of those

24   patients, whether or not they could tolerate the combo

25   product or not?

1    A.    Yes.

2    Q.    Because that would be the first-line treatment?  That

3    would be the preferential treatment to prescribe; the combo

4    product --

5    A.    Yes.

6    Q.    -- the Suboxone?

7          Yet, nevertheless, you almost exclusively

8    prescribed for these patients at Serenity Treatment Center

9    the mono form, the Subutex, and not the safer combo product

10   that was not subject to abuse or diversion; isn't that so?

11   A.    Depending on the patient.

12   Q.    Well, ma'am, during that period of time, you issued

13   prescriptions for approximately 115 patients or patients --

14          You issued prescriptions 115 times on behalf of

15   this patient population; do you know that?

16   A.    Do I know that it was 115 patients?

17   Q.    Does that sound about right?

18   A.    What was the amount of time?

19   Q.    From the end of September -- the 24th of September 2018,

20   through March 27th of 2019.

21   A.    That's probably about right.

22   Q.    And of those 115 patients, you prescribed Subutex, pure

23   Buprenorphine, 105 occasions; do you know that?

24   A.    I mean, I don't do my statistics.

25   Q.    Does that sound right?

1    A.    Possibly.

2    Q.    Would you like to go through your PDMP records at Core

3    Pharmacy?  That's the pharmacy being used by Serenity

4    Treatment Center, was it not?

5    A.    Yes.   No, I don't have to look at it.

6            MR. CLARK:  We'll call this Government's Exhibit 93

7    for identification purposes.

8            MR. HIRSCHHORN:  Was that previously provided?  So

9    the record should reflect that it was not previously

10   provided.  Could I have a copy if it wasn't previously

11   provided?

12           MR. CLARK:  Yes.

13           MR. HIRSCHHORN:  Thank you.  93-A did you say?

14           MR. CLARK:  93.

15   BY MR. CLARK:

16   Q.    Ma'am, have you had a chance to look at those?

17   A.    Yes.

18   Q.    Okay.

19   A.    I mean I don't have to look at them.

20   Q.    You remember?

21   A.    No.  I mean I'm not saying that it's wrong; I'm just

22   saying depending on the patient.

23   Q.    Well, depending on the patient, the predominant

24   first-line treatment for you was not the safer combo product,

25   but it was almost 100 percent of the time the Subutex mono

```
1    product; was it not?
2    A.   That is primarily what I prescribed, yes.
3    Q.   And, in addition to that, you prescribed to those very
4    same patients a Benzodiazepine; correct?
5    A.   Yes, the most short acting, the lowest dosage.
6    Q.   You were prescribing Ativan, were you not --
7    A.   Yes.
8    Q.   -- to 115 -- or you wrote 115 prescriptions to these
9    patients for Ativan?
10   A.   Yes.
11   Q.   So despite the warnings by the FDA, the Black Box
12   Warnings, the accepted medical treatment, you decided that
13   these patients, who were drug abusers, were at the risk of
14   obtaining illicit drugs on the street, could legitimately be
15   given both a Benzodiazepine, Ativan, as well as
16   Buprenorphine?
17              MR. HIRSCHHORN:  Objection to the --
18              THE WITNESS:  I was treating the patient.
19              MR. HIRSCHHORN:  Excuse me.  Object to the form of
20   the question.  Argumentative, multiple, and misstates the
21   facts.
22              THE COURT:  I'm going to sustain the objection as
23   it's compound.
24              MR. CLARK:  Yes, Judge.
25   BY MR. CLARK:
```

```
1    Q.   You don't disagree with me that you issued 115
2    prescriptions for Ativan?
3    A.   No.
4    Q.   That's a Benzodiazepine, correct?
5    A.   Yes.
6    Q.   The FDA doesn't make any fine distinction between
7    Ativan, Klonopin, or Xanax; do they?
8    A.   I don't know about the FDA, but I know the difference.
9    You can research it.
10   Q.   Do you?
11   A.   Yes.
12   Q.   And you prescribed Subutex for 105 or wrote 105
13   prescriptions for Subutex, correct?
14   A.   Yes.
15   Q.   So virtually every patient that you were prescribing
16   for, you prescribed a benzo with Buprenorphine; correct?
17   A.   Yes.
18   Q.   That doesn't sound very individualized to me; does it to
19   you?
20   A.   Yes, it does.
21   Q.   Each patient received the same drug protocol?
22   A.   That's not true.
23        THE COURT:  We need to take a mid-morning break.
24   I'm sorry to interrupt your examination, but ten minutes.
25   Folks, don't discuss the case.
```

1          (Jury out at 11:19 A.M.)

2          MR. HIRSCHHORN:  I was going to ask for a proffer

3    on Chapter 464 of the Florida Statutes, and I guess they

4    intend to -- maybe the witness should step out.

5          THE COURT:  It's up to you.

6          MR. HIRSCHHORN:  I guess they intend to

7    cross-examine the witness as to her knowledge of legislative

8    enactment.  And so before we go through this tortured

9    exercise, could I ask for a proffer to the Court on how it

10   intends to use this statute on this witness?  Because when it

11   was first proposed --

12         THE COURT:  The record will reflect Mr. Ahmed is

13   present, represented by counsel.

14         MR. HIRSCHHORN:  The lady is not -- she's not a

15   lawyer, and posing a Florida statute to her, I don't know how

16   we're going to get passed it in front of the jury.

17         THE COURT:  Mr. Clark, do you wish to respond?

18         MR. CLARK:  Yes, Judge.  This witness was

19   performing outside her scope of certification while at

20   Serenity Ranch, and all of these drugs that she was

21   prescribing were improperly prescribed by her.

22         MR. HIRSCHHORN:  I don't see how that requires the

23   statute.  He's on cross.  Obviously, he can ask whatever he

24   can ask.  But asking her about the statute --

25         THE COURT:  Obviously, if she has no knowledge of

1    the statute, she'll indicate she has no knowledge.

2         MR. HIRSCHHORN:  And the way he asks the question,

3    he's testifying, Judge, and I'm going to object to that.

4         THE COURT:  Well, this is cross-examination.

5         MR. HIRSCHHORN:  I know.  I agree.  I agree, it is

6    cross, and I've tried to limit my objections, including to

7    the theatrical -- every question is asked to the jury, and

8    then we go to the answer, look at the witness.  That's Mr.

9    Clark's style.  That's okay.

10        However, while it is cross-examination, I don't

11   think he can "add facts" into a question that are not yet in

12   evidence.  And unless you take judicial notice of what the

13   statute permits or doesn't permit, I object to any questions

14   along those lines.

15        THE COURT:  I'll just have to hear the question;

16   and if you have an objection, then I'll rule on it.  But I'm

17   not going to require the government to proffer its cross,

18   just as I didn't require the defense to proffer its reliance

19   on advice of counsel testimony.

20        MR. HIRSCHHORN:  I understand.

21        THE COURT:  Let's bring in the jury, please.

22        (Jury in at 11:33 A.M.)

23        THE COURT:  All right.  Folks, please be seated.

24   Miss Stevens, once again I remind you you're still under

25   oath.  And we will continue with cross-examination by Mr.

1    Clark.

2              THE WITNESS:  Okay.

3              MR. CLARK:  Thank you, Your Honor.

4    BY MR. CLARK:

5    Q.   Miss Stevens, when we left off, we were talking about

6    115 prescriptions that you provided patients at Serenity

7    Treatment Center for Lorazepam or Ativan?

8    A.   Yep.

9    Q.   And you agree with me that that is a psychotropic drug?

10   A.   Yes.

11   Q.   And are you familiar -- well, when you applied for your

12   ARPN certification in the state of Florida, you told us you

13   took an online course; did you not?

14   A.   Yes.

15   Q.   And part of that online course was to familiarize

16   yourself with the law in the state of Florida as it governs

17   persons like yourself; those who are going to practice as

18   ARPNs in this state?

19   A.   Yes.

20   Q.   And you're presumed to be aware of what conditions there

21   are of how an ARPN can perform in the state of Florida?

22   A.   Yes.

23   Q.   And, ma'am, certainly you would have been aware that

24   beginning January 1st of 2017, that ARPNs can only prescribe

25   controlled substances for treating psychological disorders by

```
 1   those who are psychiatric nurses who receive that special
 2   designation; correct?
 3           MR. HIRSCHHORN:  What statute are you reading from?
 4   In what section, please?
 5   BY MR. CLARK:
 6   Q.   Let me refer to the specific statute.  Title
 7   Section 464.012 (5)(a), which -- or (e) that states:  A
 8   psychiatric nurse who meets the requirements in
 9   Section 394.455 -- that defines what an ARPN is -- within the
10   framework of an established protocol with a psychiatrist may
11   prescribe psychotropic controlled substances for the
12   treatment of mental disorders.
13           So do you understand what that is, ma'am?
14   A.   Yes.
15   Q.   So that as of January 2017, an ARPN like yourself, who
16   was not a psychiatric ARPN, was prohibited by Florida law to
17   prescribe in the manner you were prescribing; do you agree
18   with me?
19   A.   That was never in any of the information that I had to
20   complete in order to become an ARPN in Florida.
21   Q.   Well, ma'am, as an ARPN, you're a level below a doctor;
22   correct?
23   A.   I'm a lot of levels below a doctor, but.
24   Q.   You're considered a mid-level practitioner, are you not?
25   A.   Yes.
```

1    Q.   And you have a higher status?  You have more education

2    than an RN, for instance; correct?

3    A.   Yes.

4    Q.   And this is a very controlled, regulated profession,

5    being a registered nurse practitioner; is it not?

6    A.   Yes.

7    Q.   You're dealing with people's lives, are you not?

8    A.   Yes.

9    Q.   And as an ARPN, you have to acquaint yourself with

10   Florida law and submit to testing in order to get that

11   certification?

12   A.   Yes.

13   Q.   And, ma'am, it is very clear -- it's available to

14   anybody who would look, anybody who is familiar with this

15   practice area -- that an ARPN who does not have a psychiatric

16   certification with the state of Florida, cannot prescribe

17   psychotropic medications?

18             MR. HIRSCHHORN:  Is that a question?

19             THE WITNESS:  I have never seen that.

20             THE COURT:  Is that an objection?

21             MR. HIRSCHHORN:  Yes, Your Honor.  I object.

22             THE COURT:  Overruled.

23   BY MR. CLARK:

24   Q.   You may answer.

25   A.   I have never read that anywhere.

1   Q.   This is your field of expertise, ma'am.  Not only were

2   you an ARPN, you were working at a behavioral treatment

3   center for drug abusers; correct?

4   A.   Yes.

5   Q.   And this statute directly applies to somebody who is

6   performing that role, correct?

7   A.   I don't know.  I've never seen that.

8   Q.   Would you like to read it?

9   A.   Sure.

10         MR. HIRSCHHORN:  Could the record identify what

11   we're reading from?

12         THE COURT:  Yes.  Please identify what you're

13   showing the witness.

14         MR. CLARK:  I'm showing the witness Section 464.012

15   from the Florida Statutes, as well as a Florida Board of

16   Nursing document that states:  Important legislative updates.

17         MR. HIRSCHHORN:  Objection to counsel reading, A,

18   from a document not in evidence; and, B, apparently a

19   document he's not shown me yet.

20         MR. CLARK:  I've showed you both documents.

21         MR. HIRSCHHORN:  No, no.  All you gave me was the

22   statute.  You started to say something about a Florida board.

23         MR. CLARK:  Yes.  I had shown you that previously.

24         MR. HIRSCHHORN:  You gave it to me.  Just let me

25   see what you're showing the witness, please.  This you gave

```
 1   me.
 2            MR. CLARK:  I showed you.  That's what you
 3   initially objected to.
 4            MR. HIRSCHHORN:  Oh, it's a bill.
 5            MR. CLARK:  Yes, and this is the law.
 6            MR. HIRSCHHORN:  So now we're all charged with
 7   knowledge of what bills are pending before the Florida
 8   legislature.
 9            I object to that, Judge, and any questions from
10   that.
11            MR. CLARK:  Just using it as the operative date as
12   when this law went into effect, Judge.
13            THE COURT:  Are you representing that the bill that
14   you're referring to was enacted into law and signed by the
15   governor?
16            MR. CLARK:  Yes.
17            MR. HIRSCHHORN:  I'd like to see the bill because
18   when you showed it to me, you didn't give me a copy; you just
19   showed me a copy.
20            MR. CLARK:  May I proceed, Your Honor?
21            THE COURT:  Has Mr. Hirschhorn been provided with a
22   copy of the document that you're referring to?
23            MR. CLARK:  I have shown it to him, Judge.
24            MR. HIRSCHHORN:  He showed it to me.  I pointed out
25   it was a bill.  I am not yet a speed reader.  Could I please
```

1    have a copy?

2              THE COURT:  All right.

3              MR. CLARK:  I will refer to the statute.

4              MR. HIRSCHHORN:  We have a copier right here.  We

5    will copy it right here, if you'll just give it to me.

6              THE COURT:  Why don't you give him the bill and

7    he'll copy it.

8              MR. CLARK:  I don't have the bill, Judge; I just

9    have a notice.

10             MR. HIRSCHHORN:  Oh.

11             MR. CLARK:  The bill isn't important; the law is

12   what's important, Judge, and the lady has the law before her.

13             MR. HIRSCHHORN:  And that's what I objected to,

14   because he was reading from something that he represented to

15   this Court and this jury was a bill; that, in fact, it was

16   some notice from some agency.  I would like to see what it

17   is, Your Honor, please.

18             THE COURT:  Please show the document to defense

19   counsel.

20   BY MR. CLARK:

21   Q.   Do you see the section I'm referring to, Miss Stevens?

22   I can point it out to you.  It has the blue flag on it.  It's

23   (e), (5)(e), I believe.

24             MR. HIRSCHHORN:  Your Honor, may I please see the

25   exact section counsel is talking about?

113

```
 1              THE COURT:  Yes.
 2              MR. HIRSCHHORN:  I can't find it.  I'm stupid.
 3              MR. CLARK:  (5)(a) -- (5)(e).
 4              MR. HIRSCHHORN:  Oh.
 5   BY MR. CLARK:
 6   Q.   Have you looked at it, ma'am?
 7   A.   Yes, I'm looking at it.
 8   A.   Do you have a list of requirements?
 9   Q.   No, ma'am.  That's the law.  What does the law say?
10   A.   It says:  A psychiatric nurse who meets the requirements
11   in 394.455 within the framework of an established protocol
12   with a psychiatrist may prescribe psychotropic controlled
13   substances for treatment disorders.
14              So what I'm saying is:  Do you have the
15   requirements?
16   Q.   Yes.  394 refers to the general requirements of an ARNP
17   in the state of Florida having the master's level degree and
18   two years of experience with a certified program.
19   A.   Because an ARPN, we can do what the physician allows us
20   to do.
21   Q.   If you're a psychiatric nurse, if you're prescribing for
22   psychotropics drugs in connection with your mental diagnosis
23   --
24              THE COURT:  Hold on, ma'am.  Let Mr. Clark complete
25   the question before you respond.  Go ahead.
```

```
 1    BY MR. CLARK:
 2    Q.   Ma'am, you asked about the definition of a psychiatric
 3    nurse.  I'm showing you 394, Section 394.455 of the Florida
 4    Statutes; 35, which defines what a psychiatric nurse is.
 5              MR. HIRSCHHORN:  We need a copy of that.
 6    BY MR. CLARK:
 7    Q.   Do you need to see that section, ma'am, as it defines a
 8    psychiatric nurse in the state of Florida?
 9    A.   Yes.
10              MR. HIRSCHHORN:  Make a copy of the whole thing.
11    You work for me.  You don't yet work for him.
12    BY MR. CLARK:
13    Q.   Ma'am, let me show you the statute that's referred to in
14    394.455, paragraph 35, and ask if you can tell us what a
15    psychiatric nurse is in the state of Florida?
16    A.   Psychiatric nurse --
17              THE COURT REPORTER:  I'm sorry, Judge.  I can't
18    hear her.
19              THE COURT:  Slower and into the microphone, ma'am.
20              THE WITNESS:  A psychiatric nurse means an advanced
21    practiced registered nurse licensed under 464.012 who has a
22    master's or doctorate degree in psychiatric nursing, holds a
23    national advanced practice certification in psychiatric
24    mental health advanced practice, and has two years of
25    post-master's clinical experience under the supervision of a
```

1    physician.

2    Q.   Ma'am, let me ask you:  Are a psychiatric nurse as

3    defined by the Florida Statute?

4    A.   No, I am not.

5    Q.   That's the question.  No, you are not.

6            So pursuant to Florida law, you exceeded the scope

7    of your duties by prescribing the Benzodiazepine drug Ativan

8    115 occasions during your stint at Serenity Treatment Center;

9    is that not correct?  Yes or no, ma'am?

10   A.   Nowhere in that does it say that as an adult nurse

11   practitioner we cannot prescribe.  It does not say that.

12   Q.   Ma'am, you mentioned that as part of your duties, you

13   would see patients and sign off on notes of other persons at

14   Serenity Treatment Center?

15   A.   Yes.

16   Q.   And, again, when you sign off in a note, you own that

17   note; do you not?

18   A.   Yes.

19   Q.   I am referring to Government's Exhibit 8-L, which is an

20   excerpt from Government's Exhibit 8-A, which is already in

21   evidence.  And this is the medical chart of a Dustin Eye.

22            Now, Dustin Eye was being seen been Medi MD on

23   September 14, 2018; is that correct?  Medical services

24   progress note for June 14, 2018.

25   A.   Yes.

1   Q.   And Dustin, who was a patient at Serenity, you're

2   familiar with Dustin; are you not?  Do you remember him?

3   A.   No.

4   Q.   Okay.  You prescribed for him; do you know that?

5   A.   Yes.

6   Q.   Okay.  But you don't know who he is.  Now, Mr. Eye came

7   complaining that he had nerve damage pain and he had anxiety

8   and he had insomnia and he came to the office today to

9   receive a medication refill.  Do you see that?

10  A.   Yes.

11  Q.   So Mr. Eye wanted to get more drugs from Serenity,

12  correct?

13  A.   His prescription probably ran out, so he needed a

14  refill, yes.

15  Q.   So you agree with me.  He came to Serenity to get more

16  drugs, yes?

17  A.   That's part of his treatment.  He didn't come to

18  Serenity to get more drugs.

19  Q.   It's a simple question, ma'am.  According to the chief

20  complaint, he wanted to get a refill of his drugs; is that

21  not true?

22  A.   Yes.

23  Q.   And the drug he specifically was requesting was Subutex,

24  correct?

25  A.   Yes.

```
 1    Q.   And that is for opium use disorder?
 2    A.   Yes.
 3    Q.   And that's the mono product; the product that is abused
 4    by drug users, correct?
 5    A.   Yes.
 6    Q.   And he wanted Gabapentin to deal with his nerve damage
 7    pain, correct?
 8    A.   Yes.
 9    Q.   And that is another drug that is abused by drug users
10    like Mr. Eye, correct?
11    A.   Yes.
12    Q.   And he complained of anxiety and he wanted a
13    Benzodiazepine, Ativan, correct?
14    A.   Yes.
15    Q.   And he couldn't sleep, so he wanted to have an
16    antipsychotic drug which is ordinarily used to treat
17    schizophrenia and persons suffering from bipolar disorder,
18    correct?
19    A.   Yes.
20    Q.   And the past medical history in this note, it is blank;
21    true?
22    A.   I'm sorry.  What did you say?
23    Q.   The past medical history is all blank?
24    A.   Is this my note?  This doesn't even look familiar.
25    Q.   We'll get to that, ma'am.
```

```
 1    A.    Okay.

 2    Q.    But this is a type of note that you rely upon by people

 3    at Serenity Treatment, correct?  The staff relies on the

 4    electronic medical reports for the patients?  You recognize

 5    this format, don't you?

 6    A.    No, I don't.

 7    Q.    And I was mistaken.  There is a check box here for

 8    depression anxiety.  Do you see that?

 9    A.    Yes.

10    Q.    And apparently in April of 2018, he was prescribed

11    Lorazepam; and that's Ativan, is it not?

12    A.    Yes.  This isn't mine.

13    Q.    It will be, ma'am.  Just bear with me.

14          MR. HIRSCHHORN:  Is that a question, Your Honor?  I

15    object to the comment.

16          THE COURT:  Sustained.

17    BY MR. CLARK:

18    Q.    Ma'am, could you --

19    A.    I was not prescribing Ativan at this time is what I'm

20    saying.  This is not my note.

21    Q.    I know that, ma'am.  But could you just follow along

22    with me, please?  Will you?

23    A.    Yes.

24    Q.    And these are all references to earlier sessions.  You

25    recall that he's appearing presenting in June 14, 2018, for a
```

1  refill of drugs that had been previously prescribed to him

2  not by you.  You didn't have your DEA license until June,

3  correct?

4  A.   Yes, but I didn't start doing benzos until after

5  October.

6  Q.   But you had your license in June, didn't you?

7  A.   Yes.

8  Q.   And we see Lorazepam, Buprenorphine, sublingual tablet,

9  that's Subutex, the mono product.  And these drugs were being

10  renewed for Mr. Eye on a regular basis; April 24th, May 7th,

11  May 21st.

12          And now we get to June 14, 2018.  So, again, it's

13  the same protocol; Buprenorphine, eight milligrams,

14  sublingual tablet.

15          June 14, 2018, Gabapentin for neuralgia.  What is

16  neuralgia?

17  A.   It's neuropathy nerve pain.

18  Q.   Nerve pain, you would think, in the foot; yes?

19  A.   Well, it could be in their legs or their foot or if they

20  have some sort of back injury.  A lot of them have been in

21  different traumas, and they have back injuries.

22  Q.   Quetiapine, Seroquel for insomnia; yes?

23  A.   Yes.

24  Q.   And then there is accompanying physical history.  Do you

25  see that?  Is this a physical history?

720

```
1    A.   No.  Maybe I can't --
2    Q.   I'm sorry.  Physical exam, constitutional.  None
3    reported.  What does that mean; constitutional?
4    A.   It just means any complaints, generalized complaints.
5    Q.   Well, this is actually a review of the systems?
6    A.   This is what we're asking them:  Any complaints?  Check.
7    Shortness of breath?  Whatever.
8    Q.   And what's integumentary?  Do you know what that is?
9    A.   What's your question?
10   Q.   Yes.  Integumentary, what is that?
11   A.   The skin.  It's abscesses, any infections on the skin.
12   Q.   H-E-E-N-T?
13   A.   Okay.  That is head, ears, eyes, nose, and throat.
14   Q.   Cardiovascular, I think we know what that is.
15   Genitourinary, what is that?
16   A.   That's anything urinary, bladder, any of those things,
17   kidneys, whatever.
18   Q.   And gastrointestinal, musculoskeletal, neurologic; none
19   reported, correct?
20   A.   That's what's written.
21   Q.   Yes.  So I mean when you're an ARNP, you don't do
22   everything yourself; do you?
23   A.   I mean, yes, you do.
24   Q.   But there are also other persons who are employed by
25   Serenity Treatment who are doing things under your
```

121

1    supervision, with your approval; are they not?

2    A.   Not this kind of thing.

3    Q.   So you're telling me that this was not your physical?

4    A.   Yeah, this was not -- this is not mine at all.  I've

5    never even seen that form.

6    Q.   So as far as neurologic is concerned, there was nothing

7    reported?

8         Nothing remarkable about the neurologic issues of

9    Mr. Eye?  That's what's reflected in this finding, is it not?

10   A.   That's what it says.

11   Q.   And yet Mr. Eye was complaining of -- what was it --

12   neuralgia or neuropathic pain?

13   A.   Yes.

14   Q.   And that would be indicated in this box?  That would

15   fall in the neurologic category, would it not?

16   A.   Well, if I was charting, I would have put, you know,

17   equal hand grips, all that as far as neuro.  But then you

18   would mark down that they have, you know, withdrawal

19   symptoms, they have the neuralgias associated, unless they

20   had a trauma.  I mean sometimes you just got to document

21   more.  Like this, I don't -- this form is horrible.

22   Q.   You would agree with me that this record of an

23   examination of Dustin Eye is totally absent as to any kind of

24   neuropathic pain?  Do you agree with that?

25   A.   Yes.

122

```
 1    Q.   And then psychiatric, no issues reported or observed.
 2    Hematological lymph, what is that?
 3    A.   That's -- hematological lymph is blood, but lymph is
 4    lymph nodes.
 5    Q.   And you've done that type of physical examination, have
 6    you not?
 7    A.   Yes.
 8    Q.   And you actually have to physically put your hands on
 9    the patient to examine one's lymph nodes?
10    A.   Yes.
11    Q.   And only certain people in the state of Florida are
12    permitted to do that, are they not?  You have to have a
13    certification?
14    A.   Oh, yes, yes, yes.
15    Q.   And that would consist of doctors, correct?
16    A.   Uh-huh.
17    Q.   Yes or no?
18    A.   Yes.
19    Q.   And physicians' assistants?
20    A.   Right.
21    Q.   And ARNPs?
22    A.   Right.
23    Q.   And nobody else?
24    A.   Right.
25    Q.   Because this is a very intrusive examination, and it's a
```

123

1    very important examination?

2    A.   Right.

3    Q.   Because it's on the basis of this examination that

4    persons receive their treatment and their medications and so

5    forth?

6    A.   Right.

7    Q.   And the information in here is supposed to support the

8    diagnoses and the actions taken by persons like yourself?

9    A.   Exactly.

10   Q.   And the exam continues:  Constitutional normal.  Eyes

11   normal.  ENT normal.  Neck normal.  Chest breaths normal.

12   Respiratory normal.  Cardiovascular normal.  Gastrointestinal

13   normal.  Lymphatic normal.  Musculoskeletal normal.  Skin

14   normal.

15          Neurologic, what's the entry for neurologic?

16   A.   I'm sorry?

17   Q.   What is the entry for neurologic?

18   A.   Normal.

19   Q.   No indication whatsoever of any type of neuropathic pain

20   exhibited by Dustin Eye, correct?

21   A.   That's what it says.

22   Q.   And the concluding category is:  Psychiatric normal?

23   A.   Yes.

24   Q.   And this is a comment that appears in Dustin's Eye's

25   note:  The plan of care was discussed with the patient.  All

124

1    questions were answered to satisfaction.  50 percent of the

2    time was spent counseling.  Patient was seen under the

3    supervision of Muhammad Syed, MD; correct?

4    A.   That's what it says.

5    Q.   And you know who Muhammad Syed is, don't you?

6    A.   No.

7    Q.   You never heard of Muhammad Syed?

8    A.   Is that Moe?  I don't know.  When I first started, there

9    was a nurse practitioner by the name of Moe.

10   Q.   Ma'am, I'm going to show you Government's Exhibit 95 for

11   identification purposes only, and ask if that refreshes your

12   recollection as to who Muhammad Syed is?

13          MR. HIRSCHHORN:  Can we have an identification

14   number?

15          MR. CLARK:  I said 95 for identification purposes.

16          THE WITNESS:  I have no idea who that is.

17   BY MR. CLARK:

18   Q.   You've never met this man before?

19   A.   No.

20   Q.   Yet look at the note.  Who is the person who is

21   conducting this physical examination?  Whose authority is he

22   or she operating under?  Muhammad Syed, correct?

23   A.   Yes.

24   Q.   A person you never met before?

25   A.   Right.

```
 1    Q.   Who is not a psychiatrist but an internist, correct?
 2    Yes or no, ma'am?  You saw the sheet.  Does that --
 3    A.   Right.
 4    Q.   Does that indicate he is an internist, not a
 5    psychiatrist?
 6    A.   Yes.
 7    Q.   And who signs this note?
 8    A.   He should have signed it.
 9    Q.   But who signed it, ma'am?
10    A.   Fawn.
11    Q.   And the pronunciation of that name is Pelechowski?
12    A.   Yes.
13    Q.   On June 14, 2018?
14    A.   Yes.
15    Q.   And she is the one who is attesting to having done this
16    examination, correct?
17    A.   Yes.
18    Q.   Do you know who Fawn Pelechowski is?
19    A.   Yes.
20    Q.   Who is she?
21    A.   She was a med tech at Serenity.
22    Q.   A med tech, is that right?
23    A.   Yes.  She went to school for something else; maybe CNA
24    or something.
25    Q.   Not a physician, correct?
```

```
 1    A.   Yes -- no, she's not a physician.

 2    Q.   Not a physician's assistant, correct?

 3    A.   Right.

 4    Q.   Not an ARNP like yourself?

 5    A.   Right.

 6    Q.   And yet you, on June 2, 2018, sign off on this note; do

 7   you not?  Kay Stevens Schwerin, that's your signature?

 8    A.   That is my signature.

 9    Q.   And it's dated?

10    A.   Yes.

11    Q.   And you list yourself as an ARNP/physician, correct?

12    A.   Yes.

13    Q.   But that's not true.  You're not a physician, are you?

14    A.   No.

15    Q.   You are an ARNP?

16    A.   Right.

17    Q.   And so by signing off on this note, you are adopting

18   that note?  You're making that note your own, correct?

19    A.   That's what it looks like.

20    Q.   And there was no supporting documentation, based upon

21   the physical performed to Dustin Eye on that date, that would

22   support a finding of general anxiety disorder; was there?

23    A.   No.  I don't -- I don't even think this is correct.

24    Q.   Ma'am, it's in evidence, so.

25              MR. HIRSCHHORN:  That doesn't make it correct.  I
```

1    agree --

2              THE WITNESS:  That's --

3              MR. HIRSCHHORN:  Excuse me.  Move to strike that

4    comment.  It may be in evidence, but that doesn't necessarily

5    mean it's correct.  That's for the jury to decide.  I agree

6    it's in evidence.

7    BY MR. CLARK:

8    Q.   Ma'am, these are records obtained from Serenity

9    Treatment Center; are you aware of that?

10   A.   Yes, I'm aware of that.  But --

11   Q.   Are you doubting the veracity or the truthfulness of the

12   records maintained by Serenity Treatment Center?

13   A.   Yes, that one.  I mean that doesn't even --

14   Q.   It doesn't sound like you?

15   A.   No.

16   Q.   But you would agree with me though that what's contained

17   in this file would not support a finding of general anxiety

18   disorder?

19   A.   Right.

20   Q.   It would not support a finding of neuropathic pain,

21   would it?

22   A.   No.

23   Q.   And yet, nonetheless, this person, Dustin Eye, was being

24   prescribed Seroquel, Gabapentin, Ativan, and Subutex;

25   correct?

1    A.    Yes.

2    Q.    Now, you state that this doesn't sound like you, Miss

3    Stevens; but does this sound like you, that on that same

4    date, some 11 seconds later, you stated that:  This NP does

5    not prescribe Ativan. SKS?  Does that sound like you?

6    A.    Yes.

7    Q.    So this is your notation to you signing off on Fawn's

8    note, is it not?

9    A.    That is what it says, but I still don't -- yeah.

10   Q.    Well, ma'am, you were hesitant, weren't you, about

11   prescribing Ativan to this patient population?

12   A.    Yes.

13   Q.    And here you put on the record:  This nurse practitioner

14   does not prescribe Ativan.  Kay Stevens or Kay Schwerin;

15   right?

16   A.    Yes.

17   Q.    And despite your reservations about prescribing Ativan,

18   within several months you were prescribing Ativan to all the

19   patients who you were seeing at Serenity Treatment Center,

20   correct?

21   A.    Yes.

22   Q.    Now, there is a test result that corresponds to Mr. Eye

23   that was collected on June 8, 2018.  Do you see that?

24   A.    Yes.

25   Q.    And it was reported on June 11, 2018, correct?

1    A.    Yes.

2    Q.    And that's prior to your signing off on the note in this

3    case, isn't it?

4    A.    Yes.

5    Q.    And you tell us that you had access to the test results

6    from CBS MD, and you're familiar with looking at these types

7    of results; are you not?

8    A.    Yes.  They weren't like this, but yes.

9    Q.    They contain the same type of information, perhaps in a

10   different format.  And there is a confirmation of Lorazepam,

11   which is Ativan; is that right?

12   A.    Right.

13   Q.    And you would expect to see that since he is being

14   prescribed that?

15   A.    Right.

16   Q.    Can you tell us why he was being tested for bath salts?

17   A.    To my knowledge, they -- they just run a whole panel to

18   see if anything they could possibly be using.

19   Q.    But bath salts, was anybody ever complaining of having

20   used bath salts at Serenity Treatment Center in your time

21   there?

22   A.    I've had admissions that have admitted to using bath

23   salts when I got them on admission, but I don't think -- I

24   don't know.  That's just the panel that's always been run at

25   all the treatment centers I've ever worked at.

1    Q.   You're telling me that all the labs contain an entry for
2    bath salts?
3    A.   Yes.
4    Q.   Even though the patients you were dealing with at
5    Serenity weren't actively using bath salts?
6    A.   Right.  They test for anything that could possibly --
7    that they could possibly be using or abusing.
8    Q.   Now, there is a result here for the Quetiapine or the
9    Seroquel that came back negative?
10   A.   Uh-huh.
11   Q.   You have to say yes or no.
12   A.   Yes.
13   Q.   Yet this patient was prescribed Seroquel, correct?
14   A.   Yes.
15   Q.   And the fact that he didn't test positive for the
16   Seroquel, would lead you to believe he wasn't using; correct?
17   A.   Right.
18   Q.   Or that he was selling it on the street to somebody else
19   or trading it for drugs?
20   A.   He could -- he was only on 50 milligrams.  He could have
21   been not taking it, refusing it at night.
22   Q.   Did you ever confront Mr. Eye about the fact that there
23   is no indication he's using the Quetiapine that was
24   prescribed for him?
25   A.   No.  That was a long time ago.

```
1    Q.   And then Dr. Snipes signed off on this lab results
2    months later, correct?
3    A.   Yes.
4    Q.   And that's usually when Dr. Snipes would get around to
5    signing off on labs; long after the results had come back,
6    true?
7    A.   I don't remember how long it would take.
8    Q.   Now, ma'am, concerning this note of Fawn, her having
9    conducted a physical examination of a patient, she was
10   violating the Florida law, as far as who can conduct a
11   physical examination; was she not?
12   A.   Yes.
13   Q.   And by you signing off on her note, you were endorsing
14   her actions; correct?
15   A.   Yes.
16   Q.   And pursuant to Florida law, it's grounds for discipline
17   for you to -- failure to report to the Department of Health
18   any person who's practicing outside of their lawful scope,
19   practicing medicine; correct?
20   A.   Yes.
21   Q.   And did you contact the Department of Health and say:
22   Department of Health, Fawn Pelechowski performed an illegal
23   physical examination at Serenity Treatment Center?
24   A.   No, I did not, because that is not what she was.  I
25   realize that's the form she used, but it shouldn't have been
```

1    used.

2    Q.   But you never reported this violation to the state

3    Department of Health, did you?

4    A.   No.  I didn't know that that had been done.

5    Q.   Now that you know that you were prescribing Ativan

6    inappropriately, are you going to contact the Department of

7    Health and report yourself?

8    A.   Excuse me?  What's the question?

9    Q.   Now that you know that your prescribing of Ativan was

10   not authorized in the state of Florida, given the fact you

11   are not a psychiatric nurse, are you going to report yourself

12   to the Department of Health?

13   A.   Yes.

14   Q.   Now, ma'am, as far as these drug tests are concerned,

15   people were testing positive often; were they not?

16   A.   Yes.

17   Q.   And they would report positive on a consistent basis,

18   week after week, month after month; correct?

19   A.   Yes.

20   Q.   And no action was taken, was it?

21   A.   Yes.  They were either sent to detox or put on a

22   behavioral contract.  I -- when I found out somebody had been

23   using, they did a -- or if I suspected, because there was a

24   time when we would -- they would test positive for something;

25   but until the urine count was sent off, you didn't know what

1    they tested for.  And it would take three or four days to get

2    that back, and then it would come back negative.  I would

3    hold their meds until we got the correct report back.

4    Q.   Well, you would in fact complain to the defendant, to

5    Sebastian, about the fact that these patients were testing

6    positive and they should be discharged; did you not?

7    A.   Yes, if it was -- yes.

8    Q.   And you also complained to Hector and to Al, likewise,

9    that these patients were testing positive?

10   A.   Yes.

11   Q.   And you recommended that they be discharged from

12   Serenity Treatment, because they're not following the rules

13   and they're not improving at all, they're continuing to use

14   drugs; correct?

15   A.   Yes.

16   Q.   And Sebastian, as well as Al and Hector, overrode your

17   recommendations to discharge patients; did they not?

18   A.   Yes.

19   Q.   And what medical degree or ARNP or physician assistant

20   certifications does Sebastian Ahmed have?

21   A.   None, not medical.

22   Q.   Or Al?

23   A.   Not medical.

24   Q.   And yet these two individuals, particularly Sebastian,

25   the CEO, was overriding your professional judgment that these

```
1    patients should be discharged from Serenity?
2    A.   Yes.
3    Q.   And there were other patients who actually were testing
4    negative, correct?  And they were being kicked out,
5    unbeknownst to you; is that not true?
6    A.   Wait.  They were testing negative and they were kicked
7    out?
8    Q.   Yes.
9    A.   No, I don't know about that.
10   Q.   Patients were being discharged on the weekend, correct?
11   A.   Yes, they would get discharged on the weekend.
12   Q.   You don't work weekends?
13   A.   No.
14   Q.   You had nothing to do with the discharge of those
15   patients over the weekend?
16   A.   No.
17   Q.   Your input didn't matter?
18   A.   No.
19   Q.   And you saw discrepancies between the presumptive tests
20   for the urine versus the results coming back from CBS Labs?
21   A.   Yes.
22   Q.   And you complained to the defendant, that based upon
23   what you're looking at in these lab results, Serenity -- he
24   was kicking out patients that did not use, and they were
25   allowing patients to stay that did use; correct?
```

1    A.   I -- yes, but the labs were incorrect on several

2    instances with that.

3    Q.   So we look at these labs, and these labs have glaring

4    discrepancies; true?

5    A.   Sometimes.

6    Q.   And when persons were testing positive, no action was

7    being taken to discharge them; correct?

8    A.   Well, they were -- wait.  Repeat that again.

9    Q.   Ma'am, based upon your observation of the lab reports,

10   you saw that these patients were testing positive, you'd go

11   to Sebastian and say:  Discharge these patients.  They were

12   not being discharged, true?

13   A.   Yes.

14   Q.   So what was the use of these urine tests if no action

15   was ever being taken; that they were being disregarded by

16   Sebastian and others at Serenity?

17   A.   I would say sometimes it depends.  I mean -- I guess

18   some patients -- it was individualized, I guess, sometimes.

19   You know they would have to do -- they would either get sent

20   to detox, or they would do the behavioral form.  But there

21   are certain patients, I think, that just needed special care,

22   like --

23            It's hard to explain if you don't work in that

24   industry.  I don't know.

25   Q.   There are certain patients who were favored by Sebastian

1    and Al, were there not?

2    A.   No, I don't think it's a favor thing.  It's really

3    individualized.  I mean these patients are -- they're tough,

4    and some of them just need that extra.  I mean that's --

5    that's the truth.

6    Q.   They needed that extra, such as a residential treatment

7    program; didn't they?

8    A.   If you could get them to go, yes, they would send them.

9    They don't want to go.  It's just -- it's tough.  It is

10   tough.

11   Q.   And, obviously, clearly they -- Sebastian could throw

12   out anybody he didn't want at Serenity?

13   A.   I mean -- I don't know.

14   Q.   Now, you talked about the drugs that were being obtained

15   by these patients?  Yes?

16   A.   What drugs?

17   Q.   The Buprenorphine, the Benzodiazapine, the Seroquel, the

18   Gabapentin.

19   A.   Yes.

20   Q.   All these drugs were being obtained either from you when

21   you had your license, correct?

22   A.   Yes.

23   Q.   And they also were being obtained from outside

24   physicians, true?

25   A.   No.

1   Q.   Dr. Hill?

2   A.   We only used Dr. Hill -- I never sent anybody to Dr.

3   Hill.  There was one time whenever they -- I can't remember

4   who it was.  Somebody had to go.  It was -- I don't remember,

5   but it wasn't me.  It wasn't me referring.

6   Q.   Now, the patients that you were prescribing for, many of

7   them -- the majority of them were paying for the drugs on

8   their own; isn't that true?

9   A.   I honestly don't -- I don't know how the copays worked

10  with the pharmacy.

11  Q.   Well, if you looked at your PDMP, that would reflect

12  whether it was private pay or covered by insurance; would it

13  not?

14  A.   Everybody was insurance.  I mean unless we had some --

15          MR. CLARK:  Do you have the PDMP that I provided

16  you earlier?

17          MR. HIRSCHHORN:  We do.  The really, really small

18  print?

19          MR. CLARK:  Yes.

20          THE WITNESS:  Unless they were scholarship.

21          MR. HIRSCHHORN:  Oh.  You need it back?

22          MR. CLARK:  Yes, temporarily.

23  BY MR. CLARK:

24  Q.   Ma'am, showing you the PDMP that you reviewed

25  previously, Government's Exhibit 93.  And I recognize the

1    printing is small, but please review the payment type for the

2    115 or so prescriptions that you authorized.

3              MR. HIRSCHHORN:  You mean insurance versus private

4    pay?

5              THE WITNESS:  Okay.

6    BY MR. CLARK:

7    Q.   And some of these patients were using their insurance to

8    cover the drug bills, the payment for the pharmacy

9    prescriptions; and there are other indications that they were

10   paying for it out of their own pocket, correct?

11   A.   Yes, I guess.

12   Q.   Now, this patient population, they weren't working to

13   your knowledge; were they?

14   A.   If they were in IOP, they could work, but not PHP.

15   Q.   So these PHP patients, presumably, then have access to

16   their own money to pay for the pharmacy bills; true?

17             MR. HIRSCHHORN:  Objection to the form of the

18   question.  How does she know?  Some of them might have been

19   trust account patients.

20             THE COURT:  Sustained.

21   BY MR. CLARK:

22   Q.   Do you know whether or not it was Al and Serenity

23   Treatment who were paying for these patients to fill their

24   prescriptions at Core Pharmacy?

25   A.   No, I -- I don't know.  A lot of them would call their

1    parents, and their parents would get in touch with the

2    pharmacist.

3    Q.   Now, Serenity did not have any kind of pharmacy license;

4    did they?

5    A.   We got them at the end.

6    Q.   At the end?

7    A.   Yeah.

8    Q.   But prior to that time -- prior to 2019, they didn't

9    have any pharmacy license?

10   A.   Not that I know of.

11   Q.   And Serenity Treatment and none of its employees were

12   allowed to dispense drugs, were they?

13   A.   No, the med techs would -- it's self-administered, the

14   medications.

15   Q.   So really by rights, when these patients filled their

16   prescriptions, they owned their medication; did they not?

17   A.   Yes.

18   Q.   And this is an outpatient population?  This is not

19   detox?  It's not residential, is it?

20   A.   There prescriptions were always locked up.

21   Q.   Ma'am, that's not my question.  My question to you is:

22   This is not a detox facility, is it?

23   A.   No.

24   Q.   This is not a 24-hour, 7-day-a-week lockdown facility;

25   is it?

740

```
 1    A.   No, but the meds are.
 2    Q.   The patients are presumed at an outpatient level to be
 3    able to manage their own affairs, are they not?
 4    A.   There are certain requirements for these facilities.
 5    Q.   Ma'am, the patients own their medications; do they not?
 6    A.   Yes, they own their medications.
 7    Q.   And Serenity Treatment had no authority to take their
 8    medications from them, did they?
 9    A.   They followed the guidelines for the facility.
10    Q.   Ma'am, the facility did not have a dispensing license;
11    did it?
12    A.   No.
13    Q.   It was not a lockdown facility, was it?
14    A.   It was not a lockdown facility, no.
15    Q.   It was an outpatient program, was it not?
16    A.   Yes.
17    Q.   These patients who go to outpatient, are presumed to be
18    able to manage their own medications; correct?
19    A.   Yes.
20    Q.   If they're not able to manage their own medications,
21    they don't belong in an outpatient program; correct?
22    A.   Correct.
23    Q.   And, nevertheless, these patients' drugs, after Core
24    Pharmacy filled them, would be taken over by Serenity; true?
25    A.   True.  But that's the way every facility in Florida
```

1    treatment centers is.  That is -- that is how it is.

2    Q.   Ma'am, you've been exposed to three treatment

3    facilities; have you not?

4    A.   Yes.

5    Q.   Safe Haven is where you worked before?

6    A.   Yes.

7    Q.   And Safe Haven operated just like this place, didn't it?

8    A.   Safe Haven was way worse.

9    Q.   Was worse than Serenity?

10   A.   Yes.

11   Q.   And that's how they did it; they took the drugs?

12   A.   Yes.

13   Q.   And you're considering that to be the gold standard in

14   how to operate a substance abuse treatment center; one that

15   worked even worse than Serenity?

16        MR. HIRSCHHORN:  Could the witness be permitted to

17   answer; finish her answer, Your Honor?

18        THE COURT:  Yes.  Ma'am, go ahead and finish your

19   response.

20        THE WITNESS:  At the treatment facilities that

21   is -- I don't know where the list of guidelines are, but that

22   is -- the patients aren't supposed to have the drugs in their

23   possession.

24   BY MR. CLARK:

25   Q.   Who says so?

1    A.   I don't know who says so, but that's just the way that
2    it is at all the treatment centers.
3    Q.   Whether it's legal or illegal?
4    A.   Well, it must be a guideline if all of them are like
5    that.
6    Q.   Well, you've been to three; right?
7    A.   I've work at three; I've been to others.
8    Q.   And the ones you worked at, Safe Haven, are even worse
9    than Serenity Treatment; right?
10   A.   Yes.
11   Q.   And how is the one you're working at now, Reliant?  Is
12   that a good place?
13   A.   Where I'm working right now is awesome, yes.
14   Q.   Far different from Serenity?
15   A.   Yes.  Serenity wasn't bad.  I mean that was -- they did
16   a lot of good things for a lot of people.
17   Q.   Now, ma'am, referring to various photographs that have
18   been admitted in evidence, 39-I, you've seen bags of drugs
19   like this maintained at Serenity; did you not?
20   A.   No.
21   Q.   You never saw these types of bags that were being
22   distributed to the patients on a daily basis at the center?
23   A.   Unless they put -- those were the ones that -- I know
24   they used the lockboxes.
25   Q.   Yeah.  But this is how they were being distributed to

143

| | |
|---|---|
| 1 | the patients, right? |
| 2 | A.   I didn't think they were being done -- I thought they |
| 3 | had them in the blister packs, and everybody had their |
| 4 | blister pack. |
| 5 | Q.   So you're not familiar with this method of giving the |
| 6 | patients their meds? |
| 7 | A.   I honestly don't remember. |
| 8 | Q.   Now, these patients were getting meds twice a day; once |
| 9 | in the daytime and once at night, were they not? |
| 10 | A.   Yes. |
| 11 | Q.   And so they may have had a locker facility at Serenity, |
| 12 | but they certainly didn't have one at nighttime; did they? |
| 13 | A.   They did, and a med tech went to the house.  They had -- |
| 14 | it was locked down.  They were always locked down. |
| 15 | Q.   A med tech, who is not authorized to transport other |
| 16 | people's drugs; correct? |
| 17 | A.   The drugs were at the house.  To my knowledge, the drugs |
| 18 | were at the house, and then the med tech would drive to the |
| 19 | house. |
| 20 | Q.   With the drugs, right? |
| 21 | A.   Well, they were delivered from the pharmacy.  I'm not |
| 22 | sure exactly how that process was; I will be honest. |
| 23 | Q.   Do you think the pharmacy delivered the drugs on a daily |
| 24 | basis to the patients at the houses? |
| 25 | A.   The pharmacy did deliver.  Sometimes they would deliver. |

| | |
|---|---|
| 1 | I don't know if they delivered at the houses or not. |
| 2 | Q.   Because you were never at the houses? |
| 3 | A.   Right. |
| 4 | Q.   So you don't know what happened? |
| 5 | A.   All I know is the tech was there, and their meds were |
| 6 | locked up.  And they would give the patient their med, and |
| 7 | they would take it themselves. |
| 8 | Q.   I'm showing you what's been marked as -- has been |
| 9 | admitted as Government's 41.  And I don't know if you've seen |
| 10 | this diagram before, but this is the layout, this schematic, |
| 11 | of Serenity. |
| 12 |         Does it make any sense to you?  Can you orient |
| 13 | yourself based upon the staircase? |
| 14 | A.   This is the same one we looked at on Friday? |
| 15 | Q.   Yes, I believe.  I don't know.  I don't recall. |
| 16 | A.   Yeah, that's right. |
| 17 | Q.   And I believe Sebastian's office was here, G? |
| 18 | A.   Okay, yeah. |
| 19 | Q.   Al's office next-door, H? |
| 20 | A.   Yes. |
| 21 | Q.   And where was your office? |
| 22 | A.   Half the time it was in I, and then the other half it |
| 23 | was in F, I think. |
| 24 | Q.   F is over here? |
| 25 | A.   Yes. |

1    Q.   So you're either immediately adjacent to Al's office or

2    down the hall from Al's office, correct?

3    A.   Well, it's not really a hall.  That middle area, E, is

4    open, so I could see all in there; and I could actually see

5    in Al's office from the office on that side.

6    Q.   And you stated that you went into Al's office

7    frequently, correct?

8    A.   I mean if I needed to ask him a question, he was there

9    every day from, like, 8:00 to 5:00 the whole time I was

10   there.  We were usually there close to the same time.

11   Q.   And this is Al's office?  Is that Al's office?

12   A.   Yeah.

13   Q.   And you see these lockers in Al's office?

14   A.   Right.  They don't -- they probably do not have

15   medications in them.

16   Q.   How about that locker, which is right here in the

17   photograph; does that have any medications in it?

18   A.   Yes.

19   Q.   Are those the blister packs you were referring to

20   earlier?

21   A.   Yes.

22   Q.   So these weren't under lock and key; these were stashed

23   away in Al's office in a cabinet?

24   A.   No.  I've never even seen that before.

25   Q.   And his desk drawer?

1    A.    I've never seen that.

2    Q.    Now, you talked about an elaborate system by which

3    Serenity Treatment would dispose of drugs; correct?

4    A.    I can't remember the name, yes.

5    Q.    But you were responding to questions posed by Mr.

6    Hirschhorn about how Serenity was very adamant about

7    returning drugs or disposing of drugs.  Do you recall that

8    testimony?

9    A.    Yes.

10   Q.    When these patients --

11             Again, these drugs belong to these patients; right?

12   A.    Yes.

13   Q.    These patients were prescribed these drugs supposedly

14   for a valid, legitimate, therapeutic reason?

15   A.    Right.

16   Q.    And regardless of the circumstances when they leave

17   Serenity Treatment Center, they need their drugs; do they

18   not?

19   A.    Yes.

20   Q.    So on what basis is Serenity collecting discharged

21   patients' or patients who left, and not giving them the drugs

22   that they need?

23   A.    Well, sometimes they would leave.  They would just leave

24   sometimes.  Now, I think those pictures must have been taken

25   before I started working there because I've never seen any of

1    that.

2    Q.   Ma'am, you were there during the execution of the arrest

3    warrant; weren't you?

4    A.   Yes.

5    Q.   So this is when these photographs were taken.

6    A.   I've never seen that.

7    Q.   That's squarely within the time you'd been working

8    there.  You had been working there some six months or longer,

9    seven months at that time?

10   A.   Right, but I had never -- I had not seen that.  But I

11   guess what I'm saying is sometimes when the patients left --

12   because for insurance purposes we kept the medications, and

13   then whatever facility they went to, whether it was detox or

14   another facility, they would come back and get them.

15            But if they left on a weekend and those medications

16   were at the office, then they wouldn't have them to give to

17   the patient.  But I know -- I don't know when it actually

18   started, but we would have them sign them out.  They would --

19            They couldn't take the controlled medications.

20   They would have to sign for everything that they were taking.

21   Q.   Now, showing you 42-H, do you recognize what that

22   prescription is for?

23   A.   Which one?

24   Q.   Right here.  What is that?

25   A.   Yes.

1    Q.   What is that?

2    A.   That is for bacterial vaginosis.

3    Q.   And what is that prescribed for?

4    A.   It's for a female, for a bacterial infection.

5    Q.   Right.  And those happened to be maintained in his

6    office, correct?

7    A.   Maintained?  What now?

8    Q.   These were found in Al's office?

9    A.   Oh.

10   Q.   Now, what business did Al have having this patient's

11   medication --

12            MR. HIRSCHHORN:  It might have been his girlfriend.

13            THE WITNESS:  I don't know.

14   BY MR. CLARK:

15   Q.   -- and scratching out the name?  Do you agree with me,

16   looking back at the previous exhibits, those individual

17   packets, they don't indicate what type of drugs are in there;

18   do they?

19   A.   I don't believe they did.

20   Q.   So a patient taking those drugs, they don't know what

21   they're taking; do they?

22   A.   No, not by that; but they know.

23   Q.   They do know?

24   A.   I mean --

25   Q.   There's no prescription.  There is a reason why there

149

```
 1    are prescription bottles, aren't there?
 2    A.   No, and I understand that.
 3    Q.   Ma'am, a prescription bottle has --
 4            MR. HIRSCHHORN:  Your Honor, could the witness
 5    please be permitted to finish her answer?
 6    BY MR. CLARK:
 7    Q.   My question, ma'am, is:  The prescription bottle has
 8    information on it --
 9            MR. HIRSCHHORN:  Your Honor, the witness was trying
10    to answer the question.
11            THE COURT:  They were both interrupting each other.
12            MR. HIRSCHHORN:  I understand.
13            THE COURT:  So ask your next question.  Give the
14    witness a chance to respond before asking the following
15    question.
16    BY MR. CLARK:
17    Q.   Ma'am, there is a reason prescription bottles have this
18    label; is it not?
19    A.   Yes, that's correct.
20    Q.   And it's to identify who the recipient is, correct?
21    A.   Yes.
22    Q.   And it's to indicate what type of drug is contained in
23    that bottle?
24    A.   Yes.
25    Q.   And it gives directions as to how often these pills
```

1    should be taken?

2    A.   Yes.

3    Q.   And it provides the name of the patient and the doctor,

4    correct?

5    A.   Yes.

6    Q.   And if there is any question as far as what type of

7    medication a patient is on, all you have to do is look at the

8    prescription bottle; correct?

9    A.   Yes.

10   Q.   All that information was lacking in those individualized

11   bags that were being dispensed to the patients on a regular

12   basis, were they not?

13   A.   I do not know.  I've never -- yeah, I don't know.  That

14   could have been a one-time thing with a medication that -- I

15   don't know.  I don't know what that was.

16   Q.   Ma'am, does that look like a one-time thing to you?

17   A.   Yes.

18   Q.   Does that look like a one-time thing to you?

19   A.   It looks like one-time dosages for each patient, but.

20   Q.   Does that look like a one-time thing?

21   A.   I mean it looks like one dose.

22   Q.   This is how the patients were having their drugs

23   delivered to them at the residences, wasn't it?  The tech

24   would take the patients their drugs.

25            They weren't taking their prescription bottles to

1    them, were they?

2    A.   They didn't come in bottles; they came in blister packs.

3    Q.   These are not blister packs, are they?

4    A.   No.

5    Q.   Now, getting back to my previous point, as to discarded

6    drugs, I'm showing you what's designated as J on Government's

7    41.  Do you recognize that?

8    A.   Yes.

9    Q.   And what is J?  Do you remember?

10   A.   Was that leading into the --

11   Q.   I believe that's a closet.

12   A.   Oh.

13   Q.   Do you remember the closet right outside your office?

14   A.   I mean I never really went in it or anything.

15   Q.   Let me show you Government's 42-I.  42-I is in evidence.

16   Do you recognize that closet?

17          Is that the same closet that is depicted or

18   designated as J on this sketch?

19   A.   I mean that's what it looks like, but I've never seen it

20   like that.

21   Q.   But, ma'am, it's right outside your office.

22   A.   It was always closed.  I never saw anything.

23          THE COURT:  You need to speak into the microphone,

24   please.

25          THE WITNESS:  Okay.  I'm sorry.  I'm freezing.

1           THE COURT:  Pull your chair up closer.

2           THE WITNESS:  I always saw it closed, so I've never

3    seen it like that.

4    BY MR. CLARK:

5    Q.   Right.  And there's no lock on this door, is there?  Do

6    you see the wooden handle?

7    A.   Oh.  No, it doesn't look like it.

8    Q.   And found within this closet at the time of the search,

9    were these garbage bags full of prescription medications.

10          MR. HIRSCHHORN:  The witness has already said she

11   never saw it opened.

12          THE COURT:  Is that an objection?

13          THE WITNESS:  I never saw it opened.

14          MR. HIRSCHHORN:  Objection.

15          THE COURT:  Sustained.

16   BY MR. CLARK:

17   Q.   So, ma'am, this would be inconsistent with this very

18   diligent, elaborate drug destruction system that you

19   testified to occurred at Serenity Treatment Center?

20   A.   That's -- we started doing that, maybe it was after this

21   picture, but we did.

22   Q.   Certainly it wasn't being followed before?

23   A.   I'm sorry?

24   Q.   Certainly it wasn't being followed before?

25   A.   Apparently not.

```
1   Q.   And we're talking about two big garbage bags full of

2   prescription drugs.  Is there any legitimate explanation of

3   how those drugs wound up in that closet?

4   A.   I do not know.

5   Q.   Now, you continued to work there into 2019 --

6   A.   Yes.

7   Q.   -- despite the FBI raid?

8   A.   Yes.

9   Q.   And you stayed there until when in 2019?

10  A.   Until July the 28th, or something like that.

11  Q.   Until the arrest of Sebastian and Al?

12  A.   Yeah.  A couple of weeks after, I guess.

13  Q.   And prior to that time, Serenity lost its license with

14  DCF?

15  A.   Yes.

16  Q.   And all of the patients had to leave?

17  A.   Yes.

18  Q.   And they went to Dr. Hill to get their prescriptions

19  filled?

20  A.   I -- I guess.  I don't know which doctor they went to.

21  I don't know anything about that part.  I just discharged

22  everybody out of my care.

23  Q.   Well, you recall having spoken to the agents back on

24  October 3rd of 2019 or -- 2019; correct?

25  A.   Yes.
```

1    Q.   And you told the agents on that occasion that when your

2    patients were discharged, when you could no longer prescribe,

3    that they went to Dr. Hill; correct?

4    A.   Dr. Hill or doctor -- there were probably two or three

5    different ones.

6    Q.   Dr. Hill or Dr. Javed --

7    A.   Javed.

8    Q.   -- that's where they went to get their medications?

9    A.   I discharged everybody out of my care as soon as the DCF

10   lady, I spoke with her.

11              MR. CLARK:  I have no further questions, Your

12   Honor.

13              THE COURT:  How long do you anticipate redirect?

14              MR. HIRSCHHORN:  It may be a few minutes, Judge, so

15   this would probably be a more appropriate time to take our

16   lunch recess.

17              THE COURT:  We will break for lunch now, since it's

18   20 till 1:00.  We'll reconvene at five minutes before 2:00.

19   Remember, don't discuss the case amongst yourselves or with

20   anyone else, don't do any independent research, and continue

21   to keep an open mind.

22              (Jury out at 12:41 P.M.)

23              THE COURT:  Miss Stevens, five till 2:00 we need

24   you back.

25              THE WITNESS:  I have to come back?

1    THE COURT:  Sorry.  Don't discuss your testimony

2    with anyone over the break okay.  Thank you.

3    THE COURT:  For the record, Mr. Palmer -- if you'll

4    recall, Milton Palmer during jury selection had advised us

5    that on March 13th, which is this coming Friday --

6    MR. HIRSCHHORN:  I know.

7    THE COURT:  -- that he was going to be out of town,

8    so he's reminding me.  He says:  This is a reminder that I

9    won't be available.  I won't be available for Friday,

10   March 13, 2020.  We had this discussion on February 18, 2020,

11   the day of jury selection.  You assured me we would be

12   finished by then.  I know it's early in the week, but I don't

13   know how many more days we are going to be here.

14   Obviously, if we're still -- if we have not

15   concluded the trial by Friday, we've got an option; either we

16   take Friday off, or I excuse Mr. Palmer.  But I won't require

17   him to be here on Friday.  But we can address that later.

18   MR. HIRSCHHORN:  Can I add a P.S. to Mr. Palmer's

19   note --

20   THE COURT:  Yes.

21   MR. HIRSCHHORN:  -- and respectfully remind you

22   that I was thrilled to hear about his day off.

23   THE COURT:  Oh.  That's your birthday.

24   MR. HIRSCHHORN:  It is, Judge.

25   THE COURT:  Friday the 13th is your birthday.

```
 1    MR. HIRSCHHORN:  I may never live to see another one after

 2    this trial.

 3              THE COURT:  You would like Friday off?

 4              MR. HIRSCHHORN:  I would like to, if I could.

 5              THE COURT:  Then it's off.  If we're still in

 6    trial, we'll take Friday off.

 7              MR. HIRSCHHORN:  Thank you.

 8              THE COURT:  We'll see everybody back at five till

 9    2:00.

10              (Lunch recess at 12:44 P.M.)

11              THE COURT:  The record will reflect that Mr. Ahmed

12    is present, represented by counsel.  How are we fixed for

13    jurors, Lou?

14              MR. HIRSCHHORN:  I have attorney Pam Perry here.

15              THE COURT:  Miss Perry, how are you?

16              MS. PERRY:  Nice to see you.

17              THE COURT:  Nice to see you too.

18              MS. PERRY:  Your Honor, I represent Dr. Rodriguez.

19    That is the witness with the Fifth Amendment issue.  I spoke

20    with Mr. Hirschhorn --

21              THE COURT:  We will address that just as soon as we

22    finish this witness.

23              MS. PERRY:  Yes, sir.  Very good.

24              THE COURT:  I don't know how long you anticipate.

25              MR. HIRSCHHORN:  I hope not long, Judge.
```

```
 1              MS. PERRY:  Whatever is fine with me.
 2              THE COURT:  So as soon as we finish the redirect,
 3    we'll address Dr. Rodriguez.
 4              MS. PERRY:  Thank you very much.
 5              THE COURT:  Thank you.  We've got one juror who is
 6    indisposed.
 7              MR. HIRSCHHORN:  Judge, while we're waiting?
 8              THE COURT:  Yes.
 9              MR. HIRSCHHORN:  Tonight I was wondering if we
10    could recess a little early.
11              THE COURT:  You're kidding me.
12              MR. HIRSCHHORN:  Yes.
13              THE COURT:  I mean kidding me about recessing
14    early.
15              MR. HIRSCHHORN:  Yes.
16              THE COURT:  I thought so.
17              MR. HIRSCHHORN:  But back in the day, I wouldn't
18    have been kidding.
19              THE COURT:  Let's bring in the jury, please.
20              (Jury in at 1:54 P.M.)
21              THE COURT:  All right.  Folks, please be seated.  I
22    received a note from Milton Palmer.  Mr. Palmer, I haven't
23    forgotten.  But I'll tell you what we're going to do.  I
24    don't know if y'all recall, but Mr. Palmer had indicated
25    during jury selection that he had some longstanding plans for
```

```
 1   Friday, March 13th.
 2              I don't want to lose you as a juror, so what we're
 3   going to do, if this trial has not concluded by Friday, we
 4   will take Friday off.  I see some smiles and then a little
 5   reluctance on some other folks.
 6              JUROR:  I'm ready.
 7              THE COURT:  All right.  So, anyway, that's the
 8   itinerary.  I honestly don't know if we're going to be
 9   through or not by then.
10              Miss Stevens, let me remind you that you are still
11   under oath.  We will continue with redirect examination by
12   Mr. Hirschhorn.
13                    REDIRECT EXAMINATION
14   BY MR. HIRSCHHORN:
15   Q.   Miss Stevens, could you please explain to this jury
16   why -- by the way, had you ever been in a situation where
17   the -- where any agency, state or federal, raided your place
18   of employment?
19   A.   No.
20   Q.   So was that somewhat unsettling to you?
21   A.   Yes.
22   Q.   Could you please explain in your own words why you would
23   continue to work there after the FBI raid.
24   A.   First of all, I couldn't -- like, everything we were
25   doing was on track, and I couldn't understand.  And then when
```

1    we were reassured by the owners that:  Everything's okay.  We

2    haven't done anything wrong.  It's a search, so they look

3    through all of the information.  So once they reassured us

4    that everything was okay, I loved working there, so I just

5    continued to stay.

6    Q.   Why did you love working there?

7    A.   Several different reasons.

8    Q.   Was it for the money only?

9    A.   No.

10   Q.   So why did you love working there?

11        MR. CLARK:  Objection to relevance, Your Honor.

12        MR. HIRSCHHORN:  This goes to part of why she

13   stayed, despite the FBI raid, Your Honor.

14        THE COURT:  All right.  I'll allow it.  Go ahead.

15        THE WITNESS:  I would say number one is just

16   helping the patients, trying.  You always think you're going

17   to get that next one to be okay for longer than they were the

18   last time.  Along with -- I mean we had a good crew there.

19   We were like a family.

20        When all this happened, it was -- it was horrible.

21   It was like losing a family member almost.  Like we had built

22   this really great work environment, and we were truly like a

23   family, like all of us.  And it was --

24   BY MR. HIRSCHHORN:

25   Q.   Do you ever recall being asked to do anything by

```
 1   Sebastian Ahmed that caused your heart to flutter?
 2              MR. CLARK:  Objection, Your Honor.  Beyond the
 3   scope of cross.
 4              MR. HIRSCHHORN:  No, I think not.  It goes directly
 5   to Mr. Clark asking her if she knew she was committing
 6   crimes.
 7              THE COURT:  Overruled.
 8              MR. CLARK:  Calls for hearsay, Your Honor.
 9              THE COURT:  Hold on.
10              MR. CLARK:  Objection.
11              THE COURT:  Just one second.
12              MR. HIRSCHHORN:  I didn't ask what he said; but
13   whether he ever said anything to her that caused her heart to
14   flutter.
15              MR. CLARK:  Distinction without a difference, Your
16   Honor.
17              THE COURT:  I'll overrule.  Go ahead.
18              THE WITNESS:  No.
19              THE COURT:  You cannot state the substance of any
20   direct communications with Sebastian Ahmed, but otherwise you
21   can respond.
22              THE WITNESS:  Okay.  No, never.
23   BY MR. HIRSCHHORN:
24   Q.   Who was the person responsible for deciding which
25   medication to prescribe a particular patient who came to see
```

1    you?

2    A.   I was responsible, but I went with the protocol that Dr.

3    Hernandez and I went over.

4    Q.   All right.

5    A.    If I had a question, I would call him and say, you know,

6    whatever it was.

7    Q.   Did anyone working at -- again, this calls for a yes or

8    no -- did anyone working at Serenity or Arnica or Medi MD

9    ever give you any instructions about what medication to

10   prescribe, other than your discussion with Dr. Hernandez?

11   A.   Absolutely not.

12        THE COURT:  Ma'am, let him finish the question

13   before you start to respond.

14        MR. CLARK:  Calls for hearsay, Your Honor.

15        THE COURT:  Overruled.

16   BY MR. HIRSCHHORN:

17   Q.   Did anyone at Medi MD, Arnica Health, or Serenity ever

18   give you any instructions -- without saying what they were --

19   as to what medication to prescribe, other than based on your

20   conversations with Dr. Hernandez?

21   A.   No.

22   Q.   Now, apparently Mr. Clark in his questioning to you on

23   cross-examination seems to have convinced you that you were

24   committing a crime.  Do you understand that?

25   A.   Yes.

| | |
|---|---|
| 1 | Q.   I'm not saying he's right or wrong.  I'm asking you at |
| 2 | the time you were doing what you were doing, did you think |
| 3 | you were committing a crime? |
| 4 | A.   Absolutely not. |
| 5 | Q.   And Mr. Clark then went one step further and asked you, |
| 6 | now that you admitted what you said you admitted, are you |
| 7 | prepared to self-report yourself.  Do you remember your |
| 8 | answer? |
| 9 | A.   Yes. |
| 10 | Q.   Okay.  And what are you going to do? |
| 11 | A.   I'm going to call the board. |
| 12 | Q.   Which board? |
| 13 | A.   The Medical Board and the Board of Nursing. |
| 14 | Q.   And you're going to tell them the truth? |
| 15 | A.   Yes. |
| 16 | Q.   You also said in response to a question by Mr. Clark |
| 17 | when he was talking about -- you understand, even though when |
| 18 | Mr. Clark was asking you questions and looking at the jury, |
| 19 | he was really asking you questions?  You understood that? |
| 20 | MR. CLARK:  Objection, Your Honor. |
| 21 | THE WITNESS:  Right. |
| 22 | THE COURT:  Sustained.  You don't have to include |
| 23 | these editorial comments. |
| 24 | MR. HIRSCHHORN:  That was a question, but okay. |
| 25 | I'll move on. |

1       THE COURT:  It was a part of the question that was

2    an editorial comment.

3       MR. HIRSCHHORN:  That is true, Your Honor.

4    BY MR. HIRSCHHORN:

5    Q.   I will continue to look at you and ask my questions.

6    Okay?

7    A.   Okay.

8    Q.   Now, what do you mean when you said in response to a

9    question about the nature of the people you were dealing

10   with, you started to say something about when you work in

11   this industry, and then your answer got cut off somewhere.

12       What did you mean by when you work in this

13   industry?  First, what industry?  And what are you talking

14   about?

15   A.   In the drug and alcohol rehab facilities, it's just a

16   special breed, and you -- not only do you prescribe the meds

17   to people differently, it's just a completely different way

18   that you deal with each person.  You know you want the best

19   for them, but they may not be on the same track as the other

20   person, so.  It's hard to explain if you've never worked in

21   that type of environment.

22       And everybody in that facility wanted the best for

23   that patient; whether it was a behavioral contract, keeping

24   them a couple more days, sending them to detox, you know,

25   whatever it was.  Sometimes it was just so individualized.

```
 1              MR. CLARK:  Objection, Your Honor, to her
 2    commentary that everyone at Serenity wanted only the best for
 3    the patients.  Beyond the scope of her knowledge.
 4              MR. HIRSCHHORN:  I'll rephrase the question
 5    actually.
 6              THE COURT:  Sustained.
 7    BY MR. HIRSCHHORN:
 8    Q.   As far as you knew from the medical care side -- forget
 9    about the business side.  All right?  Were you involved in
10    the business side?
11    A.   No.  I'm not a business person.
12    Q.   Did you get to select which tests to give and how much
13    they cost?
14    A.   No.
15    Q.   All right.  So forget about the business side.  Let's
16    just talk about the medical side; that was your side, right?
17    A.   Right.
18    Q.   Now, continue your answer, limiting it to the medical
19    side.
20              MR. CLARK:  Your Honor, I think the witness can
21    only fairly express her feelings; not those of anybody else.
22              THE COURT:  True.
23    BY MR. HIRSCHHORN:
24    Q.   In terms of the people you worked with, when you had an
25    issue with a patient, did you ever go to any of the
```

```
 1   clinicians or the behavioral techs --
 2   A.   Yes.
 3   Q.   -- to try to get information from them about a
 4   particular patient?
 5   A.   Yes.
 6   Q.   Did you find the information provided to you helpful in
 7   your work?
 8   A.   Yes.
 9             MR. CLARK:  Objection.  Leading, Your Honor.
10             THE COURT:  Overruled.
11   BY MR. HIRSCHHORN:
12   Q.   Now, did anyone on the medical side ever specifically
13   tell you to prescribe Ativan, regardless of the patient's
14   needs or not?
15             MR. CLARK:  Objection.  Hearsay.
16             THE COURT:  Overruled.
17             THE WITNESS:  No.
18   BY MR. HIRSCHHORN:
19   Q.   When you prescribed Ativan or any other drug, on whose
20   judgment were you relying?
21   A.   Mine.
22   Q.   During the course of the years that you worked in this
23   particular drug rehabilitation industry, did you ever come to
24   learn whether patients have different levels of tolerance?
25   A.   Yes.
```

1   Q.   Explain that to the jury from your perspective as an

2   advanced registered nurse practitioner?

3          MR. CLARK:  Objection, Your Honor, unless it

4   relates to the patients that she was treating at Serenity

5   Treatment Center.

6          MR. HIRSCHHORN:  Of course that's what I meant.

7   Sorry.

8          THE COURT:  Overruled.  Go ahead.

9          MR. HIRSCHHORN:  Do we have what I need yet?  I

10  don't need the questions; I need the documents.

11  BY MR. HIRSCHHORN:

12  Q.   Yes.

13  A.   So level of tolerance, as far as medication, how much

14  medication I would put them on?

15  Q.   Yes.

16  A.   So what we would do is base it on --

17  Q.   No, you.  Not we; you.

18  A.   Yes, I would do.  If I had a question, you know,

19  whenever we'd do their history and physical and their psych

20  evaluation, I look at, okay:  Were they using IV?  That's

21  what the majority of them use.  How many years?  How many,

22  you know, times per week?  How much per day?  And that's how

23  you based how much Subutex.

24          But because we were PHP -- they had come to us from

25  detox -- I wouldn't do any higher than eight milligrams a day

1    and then decrease from that.  But then I would follow up with

2    them once a week to try to lower it.  Sometimes it took a

3    minute to get them where they needed to be.  Some people, of

4    course, relapsed before then, you know, start back.  But the

5    tolerance level for each patient is very different.

6            And that's really what I would look at also with --

7    talking about the benzos.  Some of them may have been started

8    on benzos when they went to a psychiatrist when they were 12

9    or 13, so they've been on benzos for years.  So a lot of

10   those patients, even if you want to take them off the benzos,

11   you can't just take them off.  Huge history of seizures.

12   There's a lot of side effects when you do that.  So there's a

13   lot of patients that may have been on it for ten years.  Yes,

14   they were on benzos in detox; yes, I continued it, and then

15   just would wean them down as much as I could, hopefully wean

16   them off.  But as far as tolerance, that's kind of how that

17   would go.

18   Q.   You were shown one -- at least one patient record for

19   Government's 8-L, Dustin Eye, and I'm going to come back to

20   that in detail.  Okay?

21           But what did you consider in your mind, as an

22   advanced registered nurse practitioner, to be a success with

23   any one of the patients you dealt with?

24   A.   At Serenity?

25   Q.   At Serenity.

1    A.   Wait.  I'm sorry.  Patients' names?

2    Q.   No, no.  Not who, but what would you consider:  Wow, I

3    went home that night, I sat down with my family, and without

4    violating HIPPA, I said I did it.  What's the it?

5            MR. CLARK:  Objection as to relevance, Your Honor.

6            THE COURT:  Overruled.

7            THE WITNESS:  Having that patient that comes back

8    into my office when they are doing really, really well, and

9    they come back and they're like, okay -- it may have been

10   their fifth time in treatment, but they finally get it.  You

11   know?

12           And maybe the way that things were done, and

13   sometimes I get a little -- they stay in my office a little

14   bit longer because they feel comfortable.  So when they come

15   back and they say:  Not only did the, you know, the subs

16   help, sitting in your office talking about whatever,

17   whatever, really helped me also.  You know?  Because it's --

18   it's more than just handing out the medication, I guess.

19   It's just -- it's the whole picture.

20   BY MR. HIRSCHHORN:

21   Q.   Did any of the patients refer to you by your name, a

22   particular name, any particular way?

23   A.   Usually they called me Kay.

24   Q.   Did anyone, to your recollection, call you Dr. Kay?

25   A.   Some of them probably would.

1   Q.   Did you ever portray yourself as a doctor --

2   A.   No.

3   Q.   -- other than wearing white scrubs?

4   A.   In the beginning I would say I'm a nurse practitioner;

5   I'm not a doctor.  You know?  Because they just associate a

6   white coat with a doctor.  You know?  So I made sure

7   everybody knew that.  Some of them would still do it, you

8   know, but.

9   Q.   So I'm going to give you -- actually, I'm going to try

10  to do it up here.  I'm not sure I will be able to do it

11  correctly without getting a little help from my squad over

12  here, but -- oh, okay.

13          So you were asked a lot of questions about 8-L,

14  which was the medical -- the EMR or the medical record for

15  Dustin Eye.

16  A.   Yes.

17  Q.   Do you recall whether he came to your office/Arnica

18  directly from detox or himself presenting himself?

19  A.   I'm sure he probably came probably from -- if he was on

20  those medications, he came from detox.

21  Q.   Now, when a patient came to you from detox, what does

22  that mean?  It means?  I can't lead you, so you need to

23  explain what that means.

24  A.   Okay.  So whenever -- so Serenity was PHP.  So you go

25  detox, they'll stay in detox anywhere from -- now it's two or

| | |
|---|---|
| 1 | three days.  They need to be there 14 days or more.  So |
| 2 | they'll come to us from detox.  They've either weaned down |
| 3 | from the benzos and the subs or not.  It depends on which |
| 4 | detox they come from.  Everybody's different.  But they need |
| 5 | to. |
| 6 | They can't come to us off the street.  Like a lot |
| 7 | of them will be living park to park, you know, somebody's |
| 8 | house, park another night, whatever.  They can't just come |
| 9 | off the street into our facility.  They usually come from |
| 10 | detox, and so they are stable, you know, mentally, |
| 11 | physically, like everything before they get to us.  And then |
| 12 | that's whenever I -- |
| 13 | Q.   When a patient like Dustin Eye comes to you from detox, |
| 14 | do you expect him to have any prescriptions or pills that |
| 15 | were prescribed for him? |
| 16 | A.   Sometimes. |
| 17 | MR. CLARK:  Objection, Your Honor.  Assumes facts |
| 18 | not in evidence; whether or not Dustin Eye came from detox. |
| 19 | In fact, the records are contrary in that file. |
| 20 | MR. HIRSCHHORN:  I apologize, madam reporter.  I |
| 21 | believe the witness said probably, usually, then she said he |
| 22 | did come. |
| 23 | MR. CLARK:  I don't believe that's the state of her |
| 24 | testimony, Your Honor.  I think she's just speculating. |
| 25 | THE COURT:  Ask her. |

```
 1    BY MR. HIRSCHHORN:
 2    Q.   To the best of your knowledge, did Dustin Eye come from
 3    detox?
 4    A.   Can I back up for one second?
 5    Q.   Yes.
 6    A.   Okay.  The more I thought about that form that I saw on
 7    here that I supposedly signed, I'm not saying I didn't sign
 8    it, Fawn would send --
 9    Q.   Fawn?
10    A.   Fawn is the one that signed it.
11    Q.   This lady right here?
12    A.   Yes.
13    Q.   Okay.
14    A.   And Moe -- because the intern that was on there, I
15    think, was an intern with Moe maybe.  I don't remember who he
16    was.  So what happens, Fawn would fax the prescriptions to
17    the pharmacy.  Okay?
18         Moe worked part-time.  He didn't come in every day.
19    So what happens, if Dustin's medications needed to be
20    refilled, she had to have a way to document it in the
21    computer.  And from what I can see, she documented it in just
22    a spot where she -- she should have found -- I don't like
23    Sunwave.  That EMR is very difficult.
24         So she chose that one to document it on.  Okay?  He
25    needed the refills.  She had to send them in, but she wanted
```

| | |
|---|---|
| 1 | to have it documented.  And so what she did, more than |
| 2 | likely, is -- |
| 3 | MR. CLARK:  Objection, Your Honor, as to Fawn's |
| 4 | motivation, thought process, and signing off on the physical. |
| 5 | THE WITNESS:  Yes, it's the wrong form. |
| 6 | THE COURT:  Sustained. |
| 7 | BY MR. HIRSCHHORN: |
| 8 | Q.   No.  The Judge sustained the objection, so I now have to |
| 9 | figure out a question to ask you that will enable you to |
| 10 | answer and explain to the jury. |
| 11 | You identified this as Fawn's initials? |
| 12 | A.   Yes. |
| 13 | Q.   According to this, this looks like Fawn's initials, |
| 14 | dated June 14, 2018; right? |
| 15 | A.   Right. |
| 16 | Q.   At 3:59 P.M., you recognize that? |
| 17 | A.   Yes. |
| 18 | Q.   And that seems to be in the same record as also from |
| 19 | Government's 8-L, what you have identified as your -- |
| 20 | Are those your initials or your signature? |
| 21 | A.   Those are my initials. |
| 22 | Q.   I'm sorry? |
| 23 | A.   My initials. |
| 24 | Q.   And can you explain to the jury why -- |
| 25 | By the way, was this document prepopulated:  Kay |

1    Stevens-Schwerin, ARNP/physician?  Was it prepopulated that

2    way --

3    A.   Yes.

4    Q.   -- or did you type in?

5    A.   No, I just signed my initials.  I never knew it said

6    physician outside of the thing.

7    Q.   I'm sorry?

8    A.   I never even knew it said physician outside of there

9    until today.

10   Q.   Would you agree that perhaps a better practice would

11   have been to circle ARNP or strike out physician?

12   A.   Yeah.

13   Q.   I mean were you ever trying to represent that you were a

14   physician?

15   A.   No.

16   Q.   And in the left-hand corner you say:  Kay

17   Stevens-Schwerin.  Is that the construct pronunciation?

18   A.   Yes.

19   Q.   ARPN, correct?

20   A.   Yes.

21   Q.   Now, let me ask you.  I take it Schwerin was --

22        Is Stevens your maiden or a married name?  Help me

23   here.

24   A.   Stevens is my maiden name, which is now -- my legal name

25   is Kay S. Stevens.  Schwerin was my married named for

```
 1    20 years.  I became a nurse practitioner in 2012.  Well, the

 2    thing was -- the name change has been crazy, so.

 3    Q.   You washed that man out of your hair like Typhoid Mary?

 4    A.   I tried.  He's still not gone, but yeah.

 5    Q.   All right.  Now, you were also asked some questions

 6    about this exhibit, which shows the name Frank Snipes and the

 7    date of July 9, 2018, as having been signed.  Do you see

 8    that?

 9    A.   Right.  Uh-huh.

10    Q.   Were you present when Dr. Snipes would come into the

11    office?

12    A.   Yes.

13    Q.   And what would he do with respect to patients concerning

14    charts that had accumulated in his absence?

15    A.   He would sit down and go over everything, like all

16    the -- all the labs.  I would usually -- if I had to refer

17    somebody out, he would get -- he would call and do all the

18    referrals for me and stuff like that.

19    Q.   Before I forget, I'm going to come to some of the

20    certificates that you've earned.  Did you go to law school?

21    A.   No.

22    Q.   Could you --

23    A.   You can tell.

24    Q.   I'm sorry?

25    A.   I said you can tell I didn't go to law school.
```

1    Q.   When it came time to -- I mean when you went and studied

2    for the Florida license, did you read all the hundreds of

3    pages of Florida laws?

4    A.   No.

5    Q.   Why not?

6    A.   I know.  Because I had to get to work.

7    Q.   Now, I might have been confused by the question.  I'm

8    about to ask you to explain in relationship to the documents

9    we've been talking about, Government's 8-L.

10         MR. HIRSCHHORN:  Government's -- I don't know.  Is

11   95 in evidence yet?

12         MR. CLARK:  What you have in your hand?

13         MR. HIRSCHHORN:  Yes.

14         MR. CLARK:  It's not in evidence, no.

15         MR. HIRSCHHORN:  Well, let's see.  I can move it

16   into evidence.  May I approach the witness, Judge?

17         THE COURT:  Yes, sir.

18   BY MR. HIRSCHHORN:

19   Q.   I'm going to show you what's marked as Defendant's 95 --

20   Government's 95 -- Government's 95.

21         You were asked about a Dr. Moe or a Muhammad or

22   something.  Do you remember that?

23   A.   Right.

24   Q.   And does that document help refresh your recollection as

25   to his name?  You can't read from it; just see if it helps

| | |
|---|---|
| 1 | refresh your recollection. |
| 2 | A.   Yes. |
| 3 | Q.   Does it? |
| 4 | A.   (Nodding) |
| 5 | Q.   And what was Dr. Muhammad's last name? |
| 6 | A.   Syed. |
| 7 | Q.   Syed? |
| 8 | A.   (Nodding) |
| 9 | Q.   S-y-e-d? |
| 10 | A.   Yes. |
| 11 | Q.   Over here. |
| 12 | A.   Sorry. |
| 13 | Q.   What did he have to do with all this? |
| 14 | A.   I don't know. |
| 15 | THE COURT:  Excuse me.  Excuse me.  You need to |
| 16 | speak into the microphone. |
| 17 | THE WITNESS:  I don't know. |
| 18 | BY MR. HIRSCHHORN: |
| 19 | Q.   Well, had you ever met him? |
| 20 | A.   I don't recall. |
| 21 | Q.   Did you ever work with him to your knowledge? |
| 22 | A.   There was somebody there one time, but I don't remember |
| 23 | their name because I was -- I'm telling you, I'm in the |
| 24 | office with patients all day.  I'm sure I was introduced, and |
| 25 | he does -- the more I look at him, he does look familiar, but |

1    I didn't know him on a personal basis or anything like that.

2    Q.   Did you ever have time to go over into the closet and

3    open it up?

4    A.   No.  That's what I'm saying.

5           MR. CLARK:  Leading, Your Honor.

6           THE COURT:  Sustained.

7    BY MR. HIRSCHHORN:

8    Q.   Do you know the name of the -- the name or names of the

9    physicians that were at the detox center that referred

10   patients to you?

11   A.   No, I don't.

12          MR. HIRSCHHORN:  May I have a moment, please?

13   BY MR. HIRSCHHORN

14   Q.   So I'll retrieve that.  By the way, did you earn or were

15   you -- I don't mean awarded, but did you earn a controlled

16   substance registration certificate issued by the United

17   States Department of Justice Drug Enforcement Administration

18   in Washington, D.C. -- out of Washington, D.C.?  Did you have

19   such a certificate?

20   A.   Yes.

21   Q.   Do you remember the year/date when it was issued, or

22   would you need to see it to refresh your recollection?

23   A.   The first -- the very first one?

24   Q.   Yes.  Well, I don't know if it's the very first one.

25   A.   September of -- I think it was September of 2012 or

1    February 2013 maybe.

2    Q.    That was before you came to work here?

3    A.    Right.

4    Q.    Well, did you have one when you were working at Arnica

5    Health?

6    A.    Yes.

7    Q.    All right.

8             MR. HIRSCHHORN:  What's our next exhibit number?

9             MR. PEREZ:  109.

10   BY MR. HIRSCHHORN:

11   Q.    Let me show you what's marked as Defense Exhibit 109,

12   and ask you:  Do you recognize that certificate?

13   A.    Yes.

14   Q.    And where did you last see it?

15   A.    You mean --

16   Q.    When you were working at Arnica, where did you last see

17   it?

18   A.    Oh.  On my wall.

19   Q.    It was hanging on your wall?

20   A.    Yes.

21   Q.    And is that the certificate that you earlier described

22   as giving you some sort of authority?

23   A.    Yes.

24   Q.    And what was that authority?

25   A.    To be able to prescribe controlled substances.

1    Q.   And by controlled?

2    A.   No more than seven days at a time though.

3    Q.   Not more than seven days at a time?

4    A.   (Nodding)

5    Q.   Give me a controlled substance you could prescribe for

6    me.  Please, not an antipsychotic.

7    A.   That's exactly right.  I mean if I did Percocet, an

8    opiate.

9    Q.   Percocet?

10   A.   And opiate, yeah.

11   Q.   So you can prescribe Percocet for me if you were

12   satisfied, based upon reasonable medical certainty?

13          MR. CLARK:  Objection, Your Honor.  Beyond the

14   scope of cross-examination.

15          MR. HIRSCHHORN:  I respectfully suggest not.  It's

16   directly within the scope.

17          THE COURT:  Overruled.  Go ahead.

18   BY MR. HIRSCHHORN:

19   Q.   You could prescribe it for me for seven days, I take it?

20   A.   (Nodding)

21   Q.   And then you're done with me.  If I come back a week

22   later, you can or can't?

23          MR. CLARK:  Objection to relevance, Your Honor.

24   There's no Percocet being prescribed in this case.

25   BY MR. HIRSCHHORN:

```
 1   Q.   Pick any drug that you prescribed.
 2             MR. CLARK:  Objection to any drug that was not
 3   covered in cross-examination.  That's not relevant to the
 4   facts of this case.
 5             MR. HIRSCHHORN:  I'll rephrase the question.
 6   BY MR. HIRSCHHORN:
 7   Q.   Pick any drug that you would have prescribed to me that
 8   you prescribed to any of the patients in this case that you
 9   did so pursuant to that registration.
10   A.   Okay.  Suboxone.
11   Q.   Okay.  So you can give me Suboxone for seven days?
12   A.   Yes.
13   Q.   I come back two weeks later and we have a discussion and
14   I want --
15             MR. CLARK:  Judge, I really have to object to this.
16   This is the DEA certificate which allowed her to prescribe
17   controlled substances; it was not her data waiver, which she
18   didn't get until September.
19             MR. HIRSCHHORN:  Taking it one step at a time,
20   Judge.
21             THE COURT:  Overruled.  Go ahead.
22   BY MR. HIRSCHHORN:
23   Q.   I come back a week later, two weeks later, can you put
24   me on Suboxone for another seven days?
25   A.   Yes.
```

1   Q.   How much time has to elapse between the seven-day period

2   before you can give it to me for another seven days?

3   A.   That I do not know.

4   Q.   So you'd have to consult something, somewhere, somebody?

5   A.   Yes.

6   Q.   And would you, if that situation arose?

7   A.   Absolutely.

8   Q.   And who would you consult with?

9   A.   I -- the board.  Like I want to know.  The Medical Board

10  and the Nursing Board and DEA of course too, but.

11  Q.   Would you ever consult with Sebastian Ahmed about that?

12  A.   No.  He wouldn't know.  I mean I wouldn't think.

13          MR. HIRSCHHORN:  I move defendant's -- what's that

14  number?

15          MR. PEREZ:  109.

16  BY MR. HIRSCHHORN:

17  Q.   Is that actually the original of your certificate?

18  A.   This one?

19  Q.   Yes.

20  A.   I don't -- no, it's not.

21  Q.   Is it a true and correct copy of your original?

22  A.   Yes.

23  Q.   Move 109 in evidence.

24  A.   Well, I take that back.  I just got my brand new one

25  with my new name on it in the mail yesterday.

```
1    Q.   No.  But I mean at the time.

2    A.   Yes, it is.

3    Q.   And when was it issued?

4    A.   It was issued June of 2018.

5    Q.   June what?

6    A.   13th.

7    Q.   2018?

8    A.   Yes.

9              MR. HIRSCHHORN:  I move Defendant's 109 in

10   evidence, Your Honor.

11             MR. CLARK:  Objection, Your Honor.  This is

12   redirect.  By definition, this was never brought out in

13   either direct or cross-examination.

14             MR. HIRSCHHORN:  Your Honor, not that document; but

15   this prosecutor spent --

16             THE COURT:  Overruled.  109 will be received, and

17   the jury will accord whatever weight the jury deems

18   appropriate.

19             (Defendant's No. 109 was received)

20   BY MR. HIRSCHHORN:

21   Q.   I'm going to next show you what is marked as Defendant's

22   110, which is actually a composite of four documents.  I'd

23   like you to take a look at each of these one at a time.

24             Have you been through all four of them?

25   A.   Yes.
```

```
1    Q.   Can you tell us, without reading from them, one at a

2    time, the first one, what is it?

3            MR. CLARK:  Objection, Your Honor, to reading

4    something that's not in evidence.

5            MR. HIRSCHHORN:  I asked her not to read.  I said:

6    Without reading it, can you tell us what the first one is?

7            THE WITNESS:  My DEA license.  My DEA license.

8    BY MR. HIRSCHHORN:

9    Q.   Do you recall when that DEA license was issued?

10   A.   June the 13th, 2018.

11   Q.   And what did that DEA license give you, as you

12   understood it, the authority to do?

13   A.   Prescribe controlled substances.

14   Q.   Provided you were what?  Did you have to have a protocol

15   with anybody?

16   A.   Yes.  Underneath a physician, yes.

17   Q.   And at that time, it was who?

18   A.   Dr. Hernandez and Dr. Snipes.  Well, Dr. Snipes --

19            (Cell phone alarm ringing).

20            I'm sorry.  That was my alarm.  That was my dentist

21   appointment.

22   Q.   Oh.  You still haven't gotten that tooth done?

23   A.   I'm supposed to be there at 3:30 today.

24   Q.   Sorry.  We'll get you out of here.  So it was Dr.

25   Snipes?
```

154

```
1    A.    Dr. Snipes and Dr. Hernandez.  Dr. Snipes was the
2    primary care, and then Dr. Hernandez was the psychiatrist.
3    Q.    And is that first certificate in front of you a true and
4    correct copy of the original?
5    A.    Yes.
6    Q.    All right.  Next one.  What's the next one?  Did you
7    have another certificate?
8    A.    Yes.  This one is the -- I keep saying SAMSA, but that's
9    all those hours I had to do to pass that test.
10   Q.    Substance Abuse and?
11   A.    But it's actually through the American Psychiatric
12   Nurses Association is who you actually get your certification
13   from.  After you take the SAMSA exam, SAMSA is the person
14   that actually certifies -- you do the test, you have to have
15   a total of 24 hours of pharmacology and -- I'm sorry.  It's
16   15 hours of pharmacology and eight hours of
17   psychopharmacology.
18   Q.    You said SAMSA is the person.  You meant the entity,
19   right?
20   A.    Yes.  Yes.
21   Q.    So the second certificate in that group is from who, and
22   what does it authorize you to do?
23   A.    It allows me to prescribe the Buprenorphine, the
24   Subutex, or Suboxone.
25   Q.    And could you do that on your own, or did you have to do
```

```
1   it in a protocol with a physician?

2   A.   With a physician.

3   Q.   And did you have such a protocol?

4   A.   Yes.

5   Q.   And with whom?

6   A.   Dr. Hernandez.

7   Q.   The third certificate, what was the third certificate in

8   that packet?

9   A.   It's actually the same thing.  One is for 16 hours, and

10  one is for eight hours or something like that.

11  Q.   So you had a total of 24 hours of training --

12  A.   Yes.

13  Q.   -- that you had to take?

14  A.   MAT training is what they called it.

15  Q.   MAT, medication assisted what?

16  A.   Treatment.

17  Q.   And were you familiar with what is known as MAT?

18  A.   Yes.

19  Q.   Did you in your professional responsibilities as an

20  advanced registered nurse practitioner, acting pursuant to a

21  protocol with Dr. Hernandez, ever utilize MAT?

22  A.   Yes.

23  Q.   Why?

24  A.   Because that's the way our patients needed to be

25  treated.
```

1    Q.   Did you in your professional judgment, based upon your

2    background, experience, and training, believe that was a

3    reasonable way in which to try to treat patients?

4            MR. CLARK:  Objection, Your Honor.  Leading.

5            THE COURT:  Sustained.

6    BY MR. HIRSCHHORN:

7    Q.   Why would you -- what led you to the conclusion that

8    medication assisted treatment might be appropriate for a

9    particular patient?

10   A.   After doing their complete history and physical, and

11   really just assessing them.

12   Q.   And what exactly is MAT, medicine assisted treatment?

13           MR. CLARK:  Objection, Your Honor.  Beyond the

14   scope of cross.  I never discussed MAT.

15           MR. HIRSCHHORN:  Actually, I'll rephrase the

16   question a little differently.

17   BY MR. HIRSCHHORN:

18   Q.   You were asked a lot of questions about why you

19   prescribed certain medications to Dustin Eye, and then you

20   had this big long list of all these drugs that were

21   prescribed to people.

22           Were you authorized to prescribe those drugs?

23   A.   I'm sorry, I didn't hear you.

24   Q.   Were you authorized to prescribe those drugs?

25   A.   Yes.

```
1   Q.   And when you prescribed those drugs to the people in
2   Serenity, did you know that they were either addicts or
3   trying to recover from being addicts?
4   A.   Absolutely.
5            MR. CLARK:  Asked and answered, Your Honor.
6            THE COURT:  Overruled.
7   BY MR. HIRSCHHORN:
8   Q.   And what led you to believe, if anything, that the
9   medication that you prescribed for them was appropriate as
10  part of their treatment?
11  A.   You could see a difference in the patients after
12  medication treatment.
13  Q.   How hard did you work?
14  A.   Really hard.
15  Q.   How hard did the patients work?
16           MR. CLARK:  Objection, Your Honor.
17           THE COURT:  Sustained.
18  BY MR. HIRSCHHORN:
19  Q.   Did you have success with every patient you treated?
20  A.   No.
21  Q.   Why not?
22  A.   If I knew that answer, I would cure everybody.
23  Q.   Fair enough.  I'm sorry.  I don't mean to upset you.
24           Is there a fourth document in that packet I gave
25  you?
```

```
 1    A.   Yes.

 2    Q.   And what is that fourth document?

 3    A.   My nurse practitioner license, APRN license.

 4    Q.   Is there any special -- and when was that issued?

 5    A.   It was issued September 14th of '18.

 6    Q.   September 14, 2018?

 7    A.   Uh-huh.

 8    Q.   And who is it issued by?

 9    A.   The state of Florida.

10    Q.   Are each of those four documents true and correct copies

11    of the original certificates that you earned?

12    A.   Yes.

13         MR. HIRSCHHORN:  At this time I move Defendant's

14    110 into evidence.

15         MR. CLARK:  Again, Your Honor, I object to

16    introducing these in redirect.  Beyond the scope.

17         THE COURT:  I don't think it's beyond the scope;

18    but since new exhibits were admitted on redirect, I will

19    allow the government recross as to those exhibits only.  So

20    110 will be received.

21         (Defendant's No. 110 was received)

22    BY MR. HIRSCHHORN:

23    Q.   Now, you recall the raid by the FBI was in August of

24    2018?

25    A.   Yes.
```

1    Q.   The first page of Defendant's 110, issue date June 13,

2    2018?

3    A.   Yes.

4    Q.   The second page of Defendant's 110, completion date,

5    June 25, 2018?

6    A.   Yes.

7    Q.   Before the raid?

8    A.   Yes.

9    Q.   And you apparently earned a total of 16 hours, 13 of

10   which were in pharmacology; right?

11   A.   Yes.

12   Q.   What exactly is pharmacology?

13   A.   It's learning all about the drugs that you're

14   prescribing.

15   Q.   I'm sorry?

16   A.   Learning all about the drugs that you're prescribing.

17   Q.   And then again on June 25th, the third page of the

18   document, this certificate was presented to you on June 25,

19   2018; and this was for medication assisted treatment,

20   eight-hour-waiver training.

21         Explain that eight-hour-waiver training.

22   A.   It -- you have to learn all the information in order to

23   pass an exam to be qualified to do MAT.

24   Q.   And did you pass that exam?

25   A.   Yes.

1  Q.   Were you given a test by the American Psychiatric Nurses

2  Association --

3  A.   Yes.

4  Q.   Excuse me.  I didn't finish.

5       -- on Florida Statute 494, 39 -- whatever statute

6  you were shown, was that part of your test?

7  A.   Yes -- no.  Are you talking about the -- no.

8  Q.   I'm talking about the statute that the government showed

9  you.

10  A.   No, it didn't have anything like that on there.

11  Q.   And finally, the last exhibit in Defendant's 110 --

12  actually, there were five.  Okay.  I'll come back to that.

13       Defendant's Exhibit 110 is dated August 2, 2018.

14  That's before the raid, correct?

15  A.   Yes.

16  Q.   And here the state of Florida Department of Health is

17  certifying that you have met all the requirements of the laws

18  and rules of the state of Florida as a nurse practitioner,

19  right?

20  A.   Yes.

21  Q.   And you were -- is that ARNP license?

22  A.   They just changed that to APRN recently.

23  Q.   Advanced registered nurse practitioner; now it's

24  advanced practice registered nurse, right?

25  A.   That's what I'm saying.  They're forever changing.  I

```
 1    don't know why.

 2    Q.   And that was before the raid?

 3    A.   Yes.

 4    Q.   Now, there is a fifth document that's part of

 5    Defendant's 110 that I forgot to ask you about.

 6              Did you after the raid earn yet another

 7    certificate?

 8    A.   Yes, I did.

 9    Q.   And what was that certificate?

10    A.   It was called dispensing practitioner.

11    Q.   I'm sorry?

12    A.   Dispensing practitioner.

13    Q.   And what is a dispensing practitioner?

14    A.   If we wanted to -- I'll be honest with you.  I don't

15    know exactly.  But if -- because we never -- I never utilized

16    this.  But if I wanted to use like -- you know what?  I can't

17    even -- I was thinking it was more like -- I'm not going to

18    even answer.

19    Q.   You don't recall now exactly what it was for?

20    A.   Well, it's where you're actually allowed to -- like if

21    there are samples -- it's in connection with the pharmacy,

22    and I never did actually use it, so I don't want to say

23    something wrong.

24    Q.   So in that case, let me show you what --

25              MR. HIRSCHHORN:  Actually, before I mark this, can
```

```
 1    I approach the witness and just see if it's the same
 2    document?
 3              THE COURT:  Yes.
 4    BY MR. HIRSCHHORN:
 5    Q.   I haven't marked it yet, but is this the same document
 6    as the one we've been talking about; just in a different
 7    format?
 8    A.   Yes, these are the same.
 9    Q.   Okay.
10    A.   This is a separate -- a separate certification you can
11    apply for whenever you're renewing your license.
12    Q.   But you never used it?
13    A.   But I never used it, yes.
14    Q.   Then there is no need to put it into evidence.
15    A.   Right.  But I could dispense if I wanted to; but, like,
16    I didn't want to get into all that, yeah.
17              MR. HIRSCHHORN:  Did I move 110 into evidence?
18              THE COURT:  110 has been received, as was 109.
19    BY MR. HIRSCHHORN:
20    Q.   Now, did you understand that whether -- did you
21    understand whether part of your responsibilities as an
22    advanced practice registered nurse or advanced registered --
23    an advanced practice registered nurse, did you understand
24    whether it was part of your responsibility to coordinate
25    healthcare as necessary and appropriate, and to evaluate the
```

 1    patient -- with the patient the effectiveness of the care?

 2    A.    Yes.

 3    Q.    And did you try to do that?

 4    A.    Yes.

 5            MR. CLARK:  Objection.  Asked and answered.

 6            THE COURT:  Sustained.

 7    BY MR. HIRSCHHORN:

 8    Q.    Did you ever encounter the phrase -- and it may not be a

 9    correct phrase, it may be my phrase -- first-time users

10    versus chronic users?

11            MR. CLARK:  Objection.  Beyond the scope, Your

12    Honor.

13            THE COURT:  Sustained.

14    BY MR. HIRSCHHORN:

15    Q.    You testified at 11:25 this morning that you believe the

16    prescribing you did was individualized.  Do you remember

17    testifying to that?

18    A.    Yes.

19    Q.    In arriving at that decision, did you have to assess

20    whether the patient was someone who was new, relatively new

21    to the substance abuse disorder, or someone who had been

22    chronic?

23            MR. CLARK:  Beyond the scope, Your Honor.

24            MR. HIRSCHHORN:  Absolutely not, Judge.

25            THE COURT:  I'll overrule.  Go ahead.

```
 1              THE WITNESS:  Yes.  When we -- when I do their
 2    initial assessment, upon admission, I go through all of that;
 3    cravings, withdrawal symptoms, all those things.
 4    BY MR. HIRSCHHORN:
 5    Q.   And were your decisions as to what medications to
 6    provide, if any, driven at all by what the patient told you?
 7    A.   Yes, sometimes.
 8    Q.   Did you ever make any independent judgment as to the
 9    likelihood of the patient being truthful?
10    A.   Yes.  I mean you'd -- yeah.
11    Q.   You didn't smile, but you sort of gave a --
12    A.   Yeah.
13    Q.   Explain that.
14    A.   You -- it's hard.  You just know.  I don't know how to
15    explain it.  You know?  When you're doing your assessment,
16    you can tell if they're there for, you know, to get more
17    medication.  You know?  To --
18    Q.   We don't know; that's why we're asking you.
19    A.   You just -- you have to ask the right questions.  You
20    just -- but it didn't matter.  Even if they said:  Oh, I need
21    this or I want this, that's not what I did:  You're not going
22    to get it.  Sorry.  You know?  But you do have to get that
23    thorough history.  You know?
24    Q.   Did you ever have -- encounter any difficulty with any
25    of the patients in this case --
```

 1              By the way, other than Dustin Eye's records, have
 2      you looked at any of the other records in this case?
 3      A.   No.
 4      Q.   But just dealing with Dustin Eye, because that's the one
 5      record that you were shown, did you ever have to make a
 6      judgment call as to whether or not he was being economical
 7      with the truth?
 8      A.   Yes.
 9              MR. CLARK:  Objection, Your Honor.  Beyond the
10      scope of cross.
11              THE COURT:  Sustained.
12      BY MR. HIRSCHHORN:
13      Q.   Did what the patient tell you affect -- I think I asked
14      this already -- your ultimate prescription?
15              MR. CLARK:  If he asked it already, then it's asked
16      and answered.
17              THE COURT:  Sustained.
18              MR. HIRSCHHORN:  I'll withdraw it.  It's okay.  All
19      right.
20      BY MR. HIRSCHHORN:
21      Q.   Are you familiar with the phrase harm reduction?
22      A.   Yes.
23              MR. CLARK:  Objection.  Beyond the scope of cross,
24      Judge.
25              MR. HIRSCHHORN:  Absolutely within the scope of

```
 1    cross.
 2              THE COURT:  Sustained.
 3    BY MR. HIRSCHHORN:
 4    Q.   Did you ever make an effort in dealing with patients to
 5    reduce the likelihood of harm to them?
 6    A.   Absolutely.
 7    Q.   And did that sometimes require prescribing medication of
 8    the nature Mr. Clark described for you?
 9    A.   Yes.
10              MR. CLARK:  Objection, Your Honor.
11              THE COURT:  What's the grounds?
12              MR. CLARK:  Beyond the scope, Your Honor.
13              THE COURT:  Overruled.
14    BY MR. HIRSCHHORN:
15    Q.   In your role as an advanced registered nurse
16    practitioner, did you ever have to consult -- did you ever
17    encounter --
18              You talked about diseases and disorders when it
19    came to drug addiction, correct?
20    A.   Yes.
21    Q.   Do you remember talking about that in response to Mr.
22    Clark's questions?
23    A.   Yes.
24    Q.   Did you ever have to consult what is known as the DSM-V?
25    A.   Not really.  Sometimes.
```

```
 1    Q.   You know generally what the DSM-V is?
 2    A.   Right.
 3    Q.   Remember Mr. Clark asked you a whole bunch of questions
 4    about anxiety disorder --
 5    A.   Right.
 6    Q.   -- and what the proper medication was --
 7    A.   Right.
 8    Q.   -- for anxiety disorder?  Do you remember that?
 9    A.   Yes.
10    Q.   Do you remember he was talking about generalized anxiety
11    disorder?  Do you remember that?
12    A.   Uh-huh.
13    Q.   Did you ever encounter in dealing with these patients, a
14    different type of anxiety disorder; such as the substance
15    medication-induced anxiety disorder?
16    A.   Yes.
17              MR. CLARK:  Objection, Your Honor.  Beyond the
18    scope of cross-examination.
19              MR. HIRSCHHORN:  Definitely within the scope.
20              MR. CLARK:  And does not relate to these patients.
21    We've seen their files.  It's all general anxiety disorder
22    was what they were prescribed these substances for.
23              MR. HIRSCHHORN:  Definitely within the scope,
24    Judge.
25              THE COURT:  Sustained.
```

```
 1    BY MR. HIRSCHHORN:
 2    Q.   Now, you were shown -- this, hopefully, is my last
 3    series of questions.
 4    A.   Okay.
 5    Q.   You were shown what's marked as Government's 46-F.
 6    A.   Right.
 7    Q.   And it's labeled a sign-in form, and it has a date up
 8    there 8/7 with the line drawn through it, '18.
 9             Is that the way you write your 7's?
10    A.   No.
11    Q.   Do you know who would write their 7's that way?
12    A.   I don't.
13    Q.   Okay.  This has a bunch of patient names, right?
14    A.   Right.
15    Q.   And you don't exactly know the source of this document,
16    do you?
17    A.   No.
18    Q.   Other than the fact that the government told you it came
19    from Serenity's records, right?
20    A.   Right.
21    Q.   I want to take you through a couple of these.  For
22    example, see where it says B. E. Christopher?
23    A.   Right.
24    Q.   Now, this date is August 7, 2018; right?
25    A.   Right.  Right.
```

1    Q.   Do you see where it says:  (8/1/18 --

2    A.   Right.

3    Q.   -- and then there's a couple of words or phrases in

4    parentheses?

5    A.   Right.

6    Q.   And then there's parentheses:  (last UA result)?

7    A.   Right.

8    Q.   Would you see these sign-in forms?

9    A.   Every now and then.

10   Q.   So if you looked at this sign-in form and you saw 8/1/18

11   and the phrase last UA result, what would that tell you as a

12   physician if you were looking -- excuse me.

13           As an advanced registered nurse practitioner, what

14   would that tell you on August 7, 2018, about Christopher?

15   A.   That he popped for -- on 8/1 he popped for weed and

16   benzos.

17   Q.   When up said popped, that's a term of art.  We don't use

18   it here.  He tested positive?

19   A.   Yes.

20   Q.   But you can't tell whether it was up, down, or sideways;

21   can you?

22   A.   No.  And you can't -- that's what I was trying to

23   explain earlier; you don't know if they came from detox.

24   They -- they -- I've seen them test positive for cocaine five

25   days out of using.  Okay?  It doesn't mean they were using at

1    our place but, you know.

2    Q.    And then in the interest of time, we have the same thing

3    for Felicia B. E. 8/1/18 last UA.  Do you see that?

4    A.    Yes.

5    Q.    And then there is in parentheses:  (6 AM Class).

6    A.    That's a metabolite of an opiate.

7    Q.    What?

8    A.    6 AM Class is a metabolite of an opiate that shows up

9    only on the test that you send off and they have to come

10   back; and they don't come back for three or four days, so we

11   don't know, yeah.

12   Q.    So that's not one of those point-of-care dipstick tests?

13   A.    No.  It looks like they looked maybe -- this was on --

14   if this was on the actual 7th, then the 1st she popped -- she

15   tested positive for those.

16   Q.    Then the last two we have, Mario Ku, THC, last UA equals

17   8/3/18.  Do you see that?

18   A.    Yes.

19   Q.    And underneath that:  Marissa.  Last UA = 8/3/18 = OPI,

20   which I get is opioids, right?

21   A.    And when we -- when we look in the computer, each one of

22   those, we look at the levels.  So they -- that means they're

23   still popping.  They're still testing positive for those, but

24   their levels could be going down.

25   Q.    And their levels could be going up?

1   A.   So then we know if they're going up, then you've got to

2   go to detox or discharge.  If they're going down, okay, we're

3   working with you, you know, to continue.

4          MR. HIRSCHHORN:  Thank you.  No further questions.

5          THE COURT:  Any recross with respect to Defendant's

6   Exhibits 109 and 110 only?

7          MR. CLARK:  Yes, Your Honor.

8                        RECROSS EXAMINATION

9   BY MR. CLARK:

10  Q.   Ma'am, you stated on redirect examination that you were

11  authorized to prescribe the 115 individual prescriptions for

12  Lorazepam; correct?

13  A.   Yes.

14  Q.   And yet on redirect examination, defense counsel

15  introduced your certificate; correct?

16  A.   Yes.

17  Q.   And you were qualified as a nurse practitioner and a

18  nurse practitioner only, isn't that so?

19  A.   A nurse practitioner only?

20  Q.   Yes.

21  A.   I don't know what else would be in that.

22  Q.   Well, there could be other qualifications; such as

23  dispensing practitioner.

24  A.   Right.

25  Q.   And there could also be a designation there as being a

1    psychiatric nurse, correct?

2    A.   I don't know what their certificates look like.

3    Q.   Well, it would appear on your -- if you went and got the

4    certification with the state of Florida authorizing you to

5    prescribe psychotropic medications in connection with a

6    mental disorder, that would surely appear on your

7    certificate; would it not?

8    A.   I do not know.  I have not seen one.  I am an adult

9    nurse practitioner, certified age 13 through life; but it

10   doesn't say adult nurse practitioner on there.

11          I have recently moved to Florida, so I don't know

12   what their certificates look like.

13   Q.   But on cross-examination, you agreed with me that you

14   did not meet the criteria under Florida state law for an

15   ARNP --

16          MR. HIRSCHHORN:  Excuse me, Judge.  I thought we

17   were limited to these two exhibits, 109 and 110.  Now he's

18   talking about what he said on cross-examination.

19          THE COURT:  We are limited to these exhibits, but

20   your objection's overruled.  Go ahead.

21   BY MR. CLARK:

22   Q.   And you agreed with me, after looking at that statute,

23   that you were not authorized at the time to prescribe Ativan

24   115 times to these patients during the period of August 2018

25   through March 2019?

1    A.   Yes.  From the paperwork that you have, absolutely.  I

2    said yes.

3    Q.   And there is no reflection, of course, because you

4    didn't have it.

5         You were not designated as a psychiatric nurse

6    under the laws of Florida?

7    A.   I'm going to find out.  I'm going to do research.  I'm

8    going to the board.  I will find that out because I've never,

9    ever -- never said I cannot prescribe those medications.

10        MR. CLARK:  I have no further questions, Your

11   Honor.

12        THE COURT:  All right.  Thank you, Miss Stevens.

13   You may step down, ma'am.

14        (Witness excused)

15        (Proceedings reported and not transcribed)

16                 C E R T I F I C A T E

17   I certify that the foregoing is a correct EXCERPT

18   transcript from the record of proceedings in the

19   above-entitled matter.

20

21   May 26, 2020                    /s/ Vernita Allen-Williams

22

23

24

25